## Wytheville.

### JOHN COLES CLAY V. A. L. BUTLER, GUARDIAN, ET ALS.

#### June 15, 1922.

1. ILLEGAL CONTRACTS—*Guardian and Ward—Agent to Sell Property. Agreeing to Divide Commissions—Terms of the Contract.*—A guardian entered into a contract with appellant under which appellant was to sell certain property of his wards. Appellant agreed to divide his commissions with the guardian, but contended that such agreement only applied if the court allowed a ten per cent commission. It appearing from the terms of the admitted contract for a division of the commissions that appellant agreed to pay the guardian one-half of whatever commissions the court allowed, the burden was upon appellant to show that subsequently that contract was cancelled, or so modified as not to apply to a commission of five per cent. This burden he failed to carry out, as it plainly appeared from a preponderance of the evidence that the guardian was to receive one-half of any commissions which the court might allow appellant.

2. ILLEGAL CONTRACTS—*Words and Phrases—Locus Poenitentiae.*—A *locus poenitentiae* is defined as "a phrase meaning that the law affords an opportunity to withdraw from an illegal contract before it has been executed, that is, carried out."

3. ILLEGAL CONTRACTS—*Locus Poenitentiae—Case at Bar.*—Appellant entered into an agreement with a guardian for the sale of property of his wards, and for a division with the guardian of commissions allowed upon the sale by the court. Appellant contended that a decree declaring this agreement illegal, and that the wards were entitled to receive one-half of the commissions contracted for by their guardian was erroneous, because there had been a *locus poenitentiae*. Appellant concealed the existence of such a contract from the judge of the lower court and urged him to allow ten per cent commission, and manifested no desire to withdraw from his illegal contract until the court decided against him, and fixed the commission at five per cent, when he contended that his contract to divide the commission did not apply.

   *Held:* That there was nothing to show that appellant desired to abandon and repudiate his unlawful contract.

4. ILLEGAL CONTRACTS—*Agreement with Guardian to Share Commissions on Sale of Ward's Property—Coercion by Guardian.*—Appellant entered into an unlawful contract with a guardian to divide the commission allowed him by the court upon the sale of property of the wards of the guardian. Appellant contended that he did not stand in *pari delicto* with the guardian, because the guardian had imposed upon him the unlawful agreement to split the commission.

   *Held:* That appellant was free to enter into the illegal contract, or not, as he saw fit; and there was nothing to warrant the conclusion that the guardian occluded his freedom of will.

5. ILLEGAL CONTRACTS—*Pari Delicto.*—The man who does an illegal act and the one who pays him to perform that act, are equally guilty.

6. AGENCY—*Good Faith of Agent—Profits and Advantages Obtained Inure to Principal.*—It may be stated as a general principle that in all cases where a person is either actually or constructively an agent for another, all profits and advantages made or contracted for by him in the business, beyond the ordinary compensation to be paid him by his principal, are for the benefit of his principal.

7. GUARDIAN AND WARD—*Trusts and Trustees—Good Faith of Guardian—Guardian Obtaining Profit for Himself.*—Being trustees, guardians are not permitted to make gains to themselves of trust property in their hands.

8. ILLEGAL CONTRACTS—*Contracts Opposed to Public Policy—General Rule.*—It is a general rule that a contract or agreement cannot be enforced, if it can be impeached as being opposed to public policy; and, the courts, having in view the good of the public, and the policy of the law, will not lend their aid to enforce such a contract, *unless* they can see that to do so will defeat the object of the illegal transaction, and promote the interest of society, and the policy of the law. But where it appears that this will be the result of the enforcement of such contract, the maxim *nemo allegans turpitudinam est audiendus,* is rigorously applied, and the defendant will not be allowed to plead and prove his own wrong.

9. GUARDIAN AND WARD—*Illegal Contracts—In Pari Delicto—Whether Contract Will be Enforced or Not.*—The court will consider whether the good of the public and the policy of the law will be subserved and the making of such contracts be discouraged, by enforcing the contract in the case before it, or by refusing to do so, and will do the one or the other as will advance the interest of the public and the policy of the law.

10. ILLEGAL CONTRACTS—*Question of Law and Fact.*—Whether a

30

contract is against public policy is to be determined by the court from all the circumstances of the case and not by the jury.

11. ILLEGAL CONTRACTS—*Right of Trial by Jury—Waiver—Failure to Demand Issue Out of Chancery.*—Appellant who had entered into a contract with a guardian for a division of commissions obtained upon the sale of the property of the guardian's wards, contended that he could not be compelled to have his rights adjudicated under a rule requiring him to appear and assert his rights in a chancery suit.

*Held:* That, if appellant was ever entitled to a trial by jury, which was not conceded, he had waived that right by his failure to ask for an issue out of chancery. Moreover, appellant admitted the illegal contract and failed to show its modification or abrogation.

12. EQUITY—*Maxims.*—He who seeks equity must do equity. He who comes into equity for relief must come with clean hands.

13. FRAUD AND DECEIT—*Concealment as Fraud.*—If a party conceals a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, the concealment is as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated.

14. JUDGMENTS AND DECREES—*Final Judgments and Decrees—Illegal Contracts.*—Appellant entered into a contract with a guardian under which he was to divide the commission received by him for the sale of lands of the guardian's wards. A decree was entered confirming the sale and directing the payment of five per cent. commission to appellant. At a later term a decree was entered adjudging the contract to divide commissions illegal and directing payment of the one-half of the commissions contracted for by the guardian to his wards. Appellant contended that the last decree undertook to reverse and set aside a former decree of the court, which could only be done on a bill of review, or petition for rehearing.

*Held:* That the question was the proper distribution of funds which arose in the suit and which were still under the control of the court, and therefore there was no merit in appellant's contention.

Appeal from a decree of the Circuit Court of Campbell county. Decree for complainants. Defendant appeals.

*Affirmed.*

The opinion states the case.

*H. C. Featherston,* for the appellant.

*Wilson & Manson, Robert A. Russell* and *Frank Nelson,* for the appellees.

WEST, J., delivered the opinion of the court.

On February 3, 1919, A. L. Butler, executor of Gertrude L. Clay, entered into a written contract with John Coles Clay, employing him to sell certain real estate and personal property in Campbell county, Va., known as the John W. Clay estate. A. L. Butler was also guardian of Alice E. and Susan I. Clay, who, under the wills of their father and mother, John W. Clay and Gertrude L. Clay, were the owners of this estate. The contract provided that Clay should have as remuneration for his services ten per cent of the selling price, and that the sale price and commissions should be subject to the confirmation of the court.

Clay found a purchaser at $86,000, and on May 14, 1919, informed N. C. Manson, Jr., attorney for the guardian, that he had agreed to divide his commissions with the guardian.

Butler, as guardian for his said wards, instituted the proper proceeding in Campbell Circuit Court to have the sale confirmed. The bill, filed by him on the first Monday in June, 1919, alleged that, while the contract called for a commission of ten per cent of the selling price, Clay had agreed to accept a commission of five per cent thereon, which the complainant asked to be paid.

On June 4, 1919, a decree was entered confirming the sale and directing the commissioner, N. C. Manson, Jr., to pay John Coles Clay five per centum upon the amount of the sales for his services in making the sale.

At the November term, 1919, Commissioner N. C. Manson, Jr., who had collected the cash payment for the property, submitted a report to the court setting out all the facts with reference to the agreement between Clay and Butler to divide the commissions, and filed with his report a certificate of deposit for $2,150.00, the one-half of the commissions that were to go to Butler, and asked the direction of the court as to its disposition, and that a rule be awarded against Clay and Butler, requiring them to have their respective claims to the fund determined in the cause. Butler and Clay filed answers to the rule so issued, setting up their respective claims, and each took depositions to support his claim. On November 20, 1920, a decree was entered adjudging that the contract and agreement, by which A. L. Butler was to receive one-half of the commissions on the sale, was illegal and that his said wards were entitled to receive the one-half of the commissions contracted for by their said guardian, as a condition of his consent to the sale of their property. From this decree, John Coles Clay was granted an appeal.

The appellant contends that the decree of November 20, 1920, is erroneous for the following reasons:

(1) Because there had been a *locus poenitentiae*, and the unlawful design had not been consummated, but, on the contrary, had been abandoned and repudiated by the said Clay.

(2) Because the defendant, Clay, did not stand in *pari delicto* with Butler, the guardian, who imposed upon Clay the unlawful and burdensome agreement to split the commission under circumstances which occluded Clay's freedom of will.

(3) Because the defendant, Clay, is entitled to a trial by jury, and the court had no power to deny him this constitutional privilege and adjudicate his rights under an informal proceeding instituted merely by a rule of the court.

(4) Because the decree complained of undertakes in part to reverse and set aside a former decree of the court which could only be disturbed by regular and proper proceedings on a bill of review, or petition for rehearing, filed for that purpose.

Assignments of error one and two will be considered together, and the proper disposition of them will depend largely upon the facts shown in evidence.

Did Clay agree to divide his commissions with Butler in the event that only five per cent was allowed him for making the sale?

The written contract called for a commission of ten per cent of the selling price, subject to the confirmation of the court.

Both parties admit that they did enter into an agreement, before the suit was filed, whereby Butler was to receive one-half of the commissions which Clay collected for making the sale. Clay says he had secured a purchaser and that Butler told him if *he* did not get something out of it, *he* would not let the sale go through, and that he, Clay, made the agreement because it would be saving the work he had done, and that his agreement did not apply to the five per cent finally allowed by the court. Butler claims that he was to have one-half of whatever commission the court allowed and that the agreement applied to the five per cent just as it would have applied to the ten per cent had the court allowed ten per cent.

The entire matter of commissions, under the terms of the written contract, being left to the determination of the circuit court, and the parties not knowing whether the court would allow ten per cent, five per cent, or two and one-half per cent, it cannot be said that the admitted agreement to divide the commissions was effective only in the event that the court allowed ten per cent. It is true that Clay testified that he told Butler, after Attorney Manson

informed them that he would recommend to the court to allow only five per cent, that he would not divide with Butler the commission of five per cent, and that Butler agreed to it. But Butler contradicts this, and says that he was to receive one-half of the commissions allowed by the court, regardless of the per cent allowed. .W. E. Hazlewood testified that he heard Clay and Butler say there was to be an equal division of the commissions between them, and that Butler would recommend a ten per cent commission, but of course that would be subject to the confirmation of the court.

Clay informed Attorney Manson of the agreement to divide the commissions with Butler, before the suit was filed, but asked him to treat the matter as confidential. Manson expressed astonishment, and informed him that the contract was illegal and improper. A few weeks later, June 4, 1919, Clay and Butler appeared before Judge Barksdale and urged him to allow Clay a commission of ten per cent for making the sale. It further appears from the statement of Judge Barksdale, which is read as evidence by consent of parties, that when he informed Clay and Butler that he would enter a decree with a provision allowing a commission of five per cent, or not enter it at all, they made no mention of a division of commissions, and the decree seemed satisfactory to both. N. C. Manson, Jr., testified that "the statement of Mr. Clay was that the commissions on the sale were to be divided. He did not enter into any details further than this. He made no distinction between the ten per cent and the five per cent commission; nothing was said on the subject." If, as he contends, Clay was to receive one-half of a ten per cent commission or all of the five per cent commissions, it is difficult to explain his conduct in urging Judge Barksdale to allow ten per cent instead of five per cent.

[1] It appearing from the terms of the admitted contract

for a division of the commission that Clay agreed to pay Butler one-half of whatever commissions the court allowed, the burden was on Clay to show that subsequently that contract was canceled, or so modified as not to apply to a commission of five per cent. This burden he has failed to carry, as it plainly appears from a preponderance of the evidence that Butler was to receive one-half of any commissions which the court might allow Clay.

[2] A *locus poenitentiae* is defined as "a phrase meaning that the law affords an opportunity to withdraw from an illegal contract before it has been executed—that is, carried out."

[3] We see nothing in the conduct of the appellant, as disclosed by the record, to show that he desired to abandon and repudiate his unlawful contract. On the contrary, he concealed from Judge Barksdale the existence of such a contract and urged him to allow ten per cent commissions, so that he would be in a position to execute it. He manifested no desire to withdraw from his illegal contract until the court decided against him; and when the court fixed the commission at five per cent he contended, without success, that his contract to divide the commissions did not apply.

[4, 5] We find nothing in the record to warrant the conclusion that Butler occluded Clay's freedom of will. Clay was free to enter into the illegal contract or not, as he saw fit; and he deliberately agreed to pay Butler one-half of his commissions to institute a suit for the sale of the property belonging to Butler's wards. The man who does an illegal act, and the one who pays him to perform that act, are equally guilty.

[6] In *Central Land Co.* v. *Obenchain,* 92 Va. 143, 22 S. E. 876, the court said:

"It may be stated as a general principle that, in all cases where a person is either actually or constructively an agent

for another, all profits and advantages made or contracted for by him in the business, beyond the ordinary compensation to be paid him by his principal, are for the benefit of his principal." Story on Agency (8th ed.), sec. 211; 2 Pom. Eq. Jur., sec. 959; 1 Beach on Private Corp., sec. 237.

[7] Being trustees, guardians are not permitted to make gains to themselves of trust property in their hands. 21 Cyc., p. 78.

[8] It is a general rule that a contract or agreement cannot be enforced if it can be impeached as being opposed to public policy (Broom's Legal Maxims, 706) ; and the courts, having in view the good of the public and the policy of the law, will not lend their aid to enforce such a contract, *unless* they can see that to do so will defeat the object of the illegal transaction, and promote the interest of society and the policy of the law. But, where it appears that this will be the result of the enforcement of such contract, the maximum *nemo allegans turpitudinam est audiendus,* is rigorously applied, and the defendant will not be allowed to plead and prove his own wrong. *Cardwell* v. *Kelly,* 95 Va. 574, 28 S. E. 953.

In *Stark* v. *Littlepage,* 4 Rand. (25 Va.) 368, Judge Green, in discussing the maxim "in *pari delicto,"* said: "But this rule applies only in cases where the refusal of the courts to aid either party frustrates the object of the transaction and takes away the temptation to engage in contracts *contra bonos mores,* or violating the policy of the laws. If it be necessary, in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done, though both the parties are in *pari delicto."*

[9] The court will consider whether the good of the public and the policy of the law will be subserved and the making of such contracts be discouraged, by enforcing the con-

tract in the case before it, or by refusing to do so, and will do the one or the other as will advance the interest of the public and the policy of the law. *Cardwell* v. *Kelly, supra.*

It follows that assignments one and two are without merit.

Assignments three and four will likewise be considered together.

[10, 11] The appellant contends that he is entitled to a trial by jury and cannot be compelled to have his rights adjudicated upon a rule requiring him to appear and assert his rights in the chancery suit; and that the decree complained of undertakes to reverse and set aside, in part, a former decree in the cause, which could not be done except by a bill of review, or a petition for a rehearing, and that neither a bill of review nor a petition for a rehearing could be maintained.

Whether a contract is against public policy is to be determined by the *court* from all the circumstances of the case, and not by the *jury*. *Kuhn* v. *Buhl*, 251 Pa. St. 348, 96 Atl. 977, Ann. Cas. 1917-D, p. 415.

If the appellant was ever entitled to a trial by jury, which we do not concede, he has waived that right by his failure to ask for an issue out of chancery. Besides, we are unable to see how a trial by jury would have helped him, as he admitted making the illegal contract with the guardian and failed to show that it was afterwards modified or abrogated.

Appellant relies with confidence on *Thurman* v. *Morgan*, 79 Va. 367; *Anthony* v. *Kasey*, 83 Va. 338, 5 S. E. 176; *Nulton* v. *Isaacs*, 30 Gratt. (71 Va.) 726. These are cases of personal judgments against parties who were not in any respect parties to the suits, based upon facts wholly unlike those in the instant case, and, therefore, are not controlling here.

The question here is the proper distribution of funds which arose in the suit, and which are still under the control of the court.

[12] He who seeks equity must do equity. He who comes into equity for relief must come with clean hands. What is the status of the appellant when his conduct is tested by these rules?

He entered into a contract for a division of his commissions with the guardian of the infant children, whereby the children would be deprived of what is legally their property. He revealed the existence of this contract to the guardian's attorney, who informed him that the contract was illegal, and that the commissions which he contracted to give the guardian would, under the law, go to the infants. With full knowledge of the law, he then perpetrated a fraud upon the judge of the circuit court by withholding from him the facts, and thereby getting him to enter a decree in his favor, which the judge would not have entered had he known the facts.

[13] If a party conceals a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, the concealment is as much a fraud as if the existence of the fact were expressly denied, or the reverse of it expressly stated. 20 Cyc., p. 17.

[14] Having by his fraudulent conduct induced the chancellor, whose duty it was to protect the interests of the infant parties in the litigation, to enter a decree directing their money paid to him, the appellant will not be allowed to plead his own wrong, and is estopped to deny the jurisdiction and authority of the court, before the money is actually paid out, to enter a decree directing that such money be paid to said infants.

The decree complained of is clearly right, and will be affirmed.

*Affirmed.*