# Staunton

MERCURY INSURANCE COMPANY v. FANNIE G. GRIFFITH.

September 10, 1941.

Record No. 2445.

Present, Campbell, C. J., and Holt, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Donald T. Stant* and *Bradley Roberts,* for the plaintiff in error.

*Chas. H. Funk* and *B. L. Dickinson,* for the defendant in error.

HOLT, J., delivered the opinion of the court.

By policy of date February 21, 1939, the Mercury Insurance Company insured the household and personal effects of H. P. Griffith, then in his residence near Marion, Virginia. By rider attached, it appears that Mrs. Fannie G. Griffith was the actual owner and that loss, if any, should be payable to her.

In this home, about half-past two in the morning of March 26, 1940, a fire of accidental origin broke out.

As one enters this residence from the front there is a living room to the right and back of it a bedroom, occupied by the Griffiths. The room to the left and front is also a bedroom. In it the plaintiff contends a diamond was lost.

Sixteen or seventeen years ago, and before they were married, Mr. Griffith gave to his wife-to-be a diamond ring. On Easter Sunday before the fire, she accidently struck her hand against her car and loosened the diamond setting. On Monday, following, Mrs. Griffith secured a little open pasteboard box and about four o'clock in the afternoon "stuck the ring in there and laid the stone upon the top of the little plush". No one saw it again. Certainly the Griffiths never saw it.

Mr. Griffith was awakened by his dog scratching at his chamber door. Smoke was pouring in and the front of the house seemed to him to be a mass of flames. He woke his wife. She ran over to the home of a near-by neighbor, R. L. Anderson, to summon help. Mr. Anderson, who was a member of the fire company, called it and help came promptly. Mr. Griffith in the meantime led out his dog. Mr. Anderson came over and was told by Mr. Griffith the items which were in the room then on fire. Among the items listed were some paper money, a loaded pistol, two sets of teeth and the ring. He was asked if he remembered the diamond was there and why he did not undertake to bring it out and answered:

"Certainly. I said I wouldn't go in there if there had been a half-dozen rings in there under the condition existing. It would have been foolish is all, and as I told Mr. Anderson there was nothing valuable enough to go in there and risk yourself in the condition the room was in when I first saw it."

Mr. Griffith never went into this room until the fire seemed to be subdued.

"Q. You knew, of course, that diamond was supposed to be in there, loose in that box?

"A. Yes, sir.

"Q. You did not go in, did not enter that room at all before Mr. Anderson came?

"A. No, sir. If there had been three in there like it I wouldn't, and I insisted on him not going. I told him nothing in there was valuable enough to go in there for the condition the room was in."

Again, when asked if he had made any request of Anderson, he answered:

"I didn't ask him to get anything; he merely asked me what I had in the room, what valuables I had in the room, and I told him where I thought so and so was at, which included the items which I have mentioned."

Anderson went into this room at least twice, and it was on the occasion of his second going that he brought out this jewelry box. This, in part, is his account of his first entry:

"I had a flashlight or a fireman's lantern and got through this room. The door was open, or I pulled it open, but it was pretty badly burned around the door, and went to this dresser along the right as I went in the bed was on your left and the dresser to the right and away from the door. I opened the top drawer of the dresser and I found the pistol there where he said it would be. I took the pistol and then flashed the light over the top of the dresser, and on the dresser I noticed some false teeth. I picked them up too—I presumed Mr. Griffith would probably need them very much. I also noticed on top of the dresser a small box such as jewelers use to display rings, and in the box was a ring, a dark metal ring—I don't mean black, but not a light colored ring like silver—with the prongs which would hold a stone pointing upward and empty. I don't remember whether I picked up the ring at that time—it didn't look valuable, an empty ring with no stone in it—or whether I went out and told Mr. Griffith, but in any event I returned to him immediately with the pistol and teeth and presented them to him, and mentioned I had seen this ring on the dresser. He then said there was a valuable diamond there with it, and it took me— The confusion there was considerable, and I was a little overcome from smoke on the first trip, and it took me four or five minutes to recover. * * * "

He went into the room again:

"I went back the second time—I am sure I didn't bring

it out the first time, that it must have remained there—
and I flashed the light and did find the box still there
and I picked up the box, and flashed the light over the
dresser, and about that time I was overcome with the
smoke again and began to vomit and I retreated again.''

This room, into which water had been turned, was lit-
tered with the debris of falling plaster, and its parti-
tions had been partly destroyed. About a yard from
the dresser was a hole a foot wide and three or four
feet long burned in the floor.

Coverage is now conceded, although the insurance ad-
juster at first contended that the diamond was not among
those things protected by the policy. We are to deter-
mine if its loss was the direct result of the burning of
the home insured.

On the occasion of the handling of the open box by
Anderson it is entirely probable that the stone fell out.
If he was so overcome by smoke and dust as to vomit, he
could not have been careful in the manner in which he
held the box or anything else which he was then bring-
ing out. His immediate concern was his own safety.
And so we reach the conclusion that the loss of this stone
from the open box was one of the direct results of that
fire. It has never been found, although the Griffiths
searched for it in the debris of this fire after it had
cooled off.

In the policy of insurance is this provision:

''This company shall not be liable for loss or damage
caused directly or indirectly * * * by the neglect of
the insured to use all reasonable means to save and pre-
serve the property at and after a fire * * * .''

Mrs. Griffith, the owner, lightly clad as she must have
been, could not have been expected to enter this burning
home. Mr. Griffith has also given us convincing reasons
which held him back. People whose homes are burning
do not always show good judgment, or, indeed, any judg-
ment at all, as is attested by many time-worn tales. That
they were more careful of their persons than of their
property was to have been expected.

After some negotiation, the loss on certain properties injured or destroyed was adjusted, and there was delivered to Mrs. Griffith a check dated April 1, 1940, for $1,689.02, on the face of which this appears * * * "which payment constitutes full satisfaction of all claims and demands for loss and damage by fire which occurred on March 26, 1940, to property described under policy No. 7388 issued at the Marion, Virginia, Agency."

The Insurance Company contended that the check with the memorandum thereon was in full satisfaction of Mrs. Griffith's claim. She, on her part, contended that the value of this lost diamond was not taken into consideration; that her claim for it was left unadjusted and to be thereafter passed upon. The defendant was not willing to pay for it; hence this action. She has recovered a verdict of $600.00, confirmed by the court.

Assuming, as we do, that liability once attached, has recovery been precluded by the acceptance of the $1,689.02 check?

On March 26, 1940, the Griffiths submitted an itemized list of their claim, in amount $2,581.97. From this the insurance adjuster, Mr. McFern, deducted $892.95, in which deduction was the value of this diamond, placed at $650.00, he being of opinion that it was not covered by the policy. Thereafter the company's draft for $1,689.02, with the endorsement thereon noted, was sent to W. W. Hawkins, who, as local agent for his company, had written and delivered the policy to Mr. Griffith. When losses came to be determined, Mr. McFern, as we have seen, was of opinion that there was no coverage. Mr. Hawkins, who issued the policy, did not agree with him. As we have seen there was in fact coverage, and so the major matter in issue was not coverage but loss.

A draft for the amount conceded to be due was sent to Mr. Hawkins and was delivered by him to the Griffiths, which was cashed by them somewhere about April 8. The Insurance Company further contends that the Griffiths, whatever may have been their antecedent rights,

are now precluded from a recovery in this case because of the memorandum written across the face of the draft. We must, therefore, examine into the conditions in which it was cashed and into those negotiations which led to its acceptance.

The matter hung fire because, as Mr. Hawkins said, Mr. Griffith, who was acting for his wife, "refused it because the question of the ring was still out and had not been settled."

During Mr. Griffith's examination this occurred:

"By the Court:

"Did you accept that check as full payment? I believe I will let him answer the question. I think it is going to be determined by what happened between the parties at the time.

"By Mr. Stant:

"Exception.

"A. The check was not accepted in full payment of the claim, but with the understanding that I had authority from Mr. Hawkins, who I had done my business with for the past eight or nine years, to accept the check and I could take the matter of the ring up in case it was not found during the rebuilding of the house, and under those conditions I accepted the check. I had that understanding with Mr. Hawkins who I had done all my business with in the past eight or ten years in handling my insurance, and not any other agent or representative. He is the man I would have appealed to about any insurance question—I know of no one else to handle it with."

Later he said that Mr. Hawkins came to see him and said that he had been in correspondence with some of his representatives as a result of which he then said to him: "You can accept this now, you can accept this check now because I have a letter here from so-and-so that he says gives you the authority to accept it and take the matter up later."

Griffith again stated his reasons for acceptance:

"The figures were accepted with this understanding,

your Honor, that I had been told by the adjuster and was under the impression as I said that the ring was not covered by the policy. That is what he said—not that it didn't burn or objection like that, but that it was not covered by the policy and he produced a policy there that was supposed to be the same as this saying it wasn't, and that is why settlement was made at that time —not that it didn't burn, or any possibility like that, but that it was not covered."

Mrs. Griffith also said: "We didn't accept the check in full settlement of all losses."

On April 2, 1940, Mr. Hawkins wrote to Mr. J. A. Belmeur, State agent for his company at Richmond, Virginia, and said that he was in receipt of a $1,689.02 check but before accepting it Mrs. Griffith wished him to "take up with you" liability for the lost diamond. Mr. Belmeur replied stating that the loss of a diamond by fire was unusual and suggested that further search be made, and concluded by saying:

"As Mr. McFern was on the scene and is more familiar with the circumstances than we are, it would possibly be best that we acquaint him with these facts so that he can write you further in this regard."

This correspondence was referred to Mr. McFern, who pointed out that diamonds were not ordinarily injured by fire and that no evidence to that effect had been presented, and concludes his letter by saying:

"Should the diamond be recovered by the assured and found to be in a damaged condition, upon your further advices I shall be glad to inspect the diamond and make any further recommendations to the Mercury Insurance Company concerning any claim for damage to the stone by fire, if recovered."

This letter Mr. Hawkins read to Mr. Griffith, as appears from this excerpt from his testimony:

"I read Mr. Griffith that letter, and he accepted that check on the objections that it would be reopened."

On May 3, Hawkins wrote to Belmeur to the effect that Mrs. Griffith was still claiming loss for her diamond and suggested that Belmeur come out and take up the matter with her, or with Mr. McFern. Mr. Belmour replied by letter of date May 29, 1940, and, in part, said:

"We have heard nothing further regarding the controversy concerning the alleged loss of a diamond ring, but assume that you are keeping in touch with the situation and will write Mr. McFern if anything further develops; and I think we are correct in proceeding along the lines agreed upon at the time of my last visit."

From this evidence we think it plain that the Griffiths never intended to accept the check in full settlement of their claim for the diamond, and it is fairly clear that the company itself did not regard the matter definitely at an end. Hawkins, who wrote the policy and who was the company agent with whom the Griffiths came in contact, definitely told them when they accepted the check that they might take the matter up later. Primarily, the trouble seems to have been occasioned by the adjuster, who thought that there was no coverage. In this he was definitely wrong.

In *Norfolk Hosiery & Underwear Mills Co.* v. *Westheimer*, 121 Va. 130, 92 S. E. 922, is this headnote, sustained by the record:

"4. RECEIPT—'In Full.'—Where a servant had endorsed and used a check of his master, containing the entry on its face 'in full to July 1, 1915,' this constitutes *prima facie* evidence that such payment was in full of the servant's salary to July 1, 1915. But it was *prima facie* evidence only of such fact. The servant was at liberty, notwithstanding his acceptance and use of such check, to prove the correct status of the account between him and his master. The acceptance and use of such check merely placed the burden of proof upon the servant."

In *County of Campbell* v. *Howard & Lee*, 133 Va. 19, 112 S. E. 876, an attorney said to the County Board:

"If you will give me my thousand dollars, I will get out of it and won't have anything more to do with you." This, the court said, constituted an accord under the Virginia statute, Code, section 5769. But where, before the money was paid and before a warrant was issued, he withdrew his proposition and gave notice of his rights, the agreement to accept was without consideration. Afterwards the Board directed that warrant issued for $1,000 "in full compensation of his services." It was held that this endorsement did not bind the payee. He was permitted to recover. The court in concluding an extended opinion said:

"The circumstances relied on by the county as having the effect of an accord and satisfaction which barred the demand of Mr. Howard consist merely of his acceptance of the payment of the $1,000.00 warrant issued to him after the appeal aforesaid had been taken as aforesaid. There was no evidence before the jury that such payment was made in pursuance, either of any express agreement on the part of Mr. Howard, that it would be received in full satisfaction of his demand which is in question, so as to bring the case within the statute (section 5765), or of an implied agreement to that effect, which would leave the case stand as at common law. And, under the principle above adverted to, the county, by the payment of the warrant to Mr. Howard for the $1,000.00 after notice of the terms on which he would alone accept it, waived the aforesaid condition contained in the warrant itself. 1 C. J. 460. Hence, neither under the statute nor at common law was there any accord and satisfaction which barred the claim of Mr. Howard."

In *Hibbs* v. *First Nat. Bank of Alexandria,* 133 Va. 94, 112 S. E. 669, 25 A. L. R. 120, it was held that an agreement between a debtor and creditor fixing the amount of an unliquidated demand constituted an accord.

In *McGuire* v. *Martin,* 152 Va. 453, 147 S. E. 265, the court gave this instruction:

."The court instructs the jury that even if you do believe from the evidence that a check was delivered to the plaintiff by defendant, marked 'Account in full for shoulder work N. C. Pro. 181,' this is *prima facie* evidence but not conclusive that said check was accepted in full settlement. But if the plaintiff endorsed said check knowing of the presence of said marking thereon, the jury should find for the defendant."

This last sentence was more favorable to the defendant than it should have been. The court, in its criticism, said:

"The last sentence of instruction No. 5, as amended, is more favorable to the defendant than he was entitled to have it. *Norfolk Hosiery, etc., Co.* v. *Westheimer*, 121 Va. 130, 92 S. E. 922."

In C. J. S., Vol. 1, page 476, the substance of section 6 on Accord and Satisfaction is there stated:

■ "The thing agreed to be given or done in satisfaction must be offered and intended by the debtor as full satisfaction, and accepted as such by the creditor."

Among many cases cited is *McGuire* v. *Martin, supra.*

■ The acceptance of a check on which appears "in full of account," or words of like import, does not in fact close the account unless it was accepted with intelligent appreciation of its possible consequences, coupled with knowledge of all relevant facts. To be final it must have been so intended.

Where a debtor tenders an amount conceded to be due coupled with a condition that the creditor, before acceptance, must release some other claim in honest dispute, we have a situation which may amount to duress and which may, under conceivable conditions, come close to blackmail.

■ There was never any agreement on behalf of these Griffiths either expressed or implied to accept this check in full satisfaction of their claim. This the Insurance Company certainly knew, and it may fairly be inferred that they acquiesced in the insured's desire to hold the

matter over for further adjustment.  At the most, this memorandum check endorsement but raises a *prima facie* case of estoppel, which has been fully met.

There are no reversible errors in the record.  The judgment appealed from should be affirmed, and it is so ordered.

*Affirmed.*