**VIRGINIA IMPRESSION PRODUCTS CO., Inc., Appellant,**

v.

**SCM CORPORATION, Appellee.**

**VIRGINIA IMPRESSION PRODUCTS CO., Inc., Appellee,**

v.

**SCM CORPORATION, Appellant.**

**Nos. 15041, 15042.**

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1971.

Decided Aug. 30, 1971.

John S. Battle, Jr., Richmond, Va., and Stephen R. Kaye, New York City (Richard L. Williams, and McGuire, Woods &

Battle, Richmond, Va., and Ronald S. Rauchberg and Allen P. Rosiny, and Proskauer, Rose, Goetz & Mendelsohn, and Jerry Oppenheim, New York City, on brief), for appellant in No. 15042 and appellee in No. 15041.

John S. Martel, San Francisco, Cal. (Thomas Elke, Jerome I. Braun and Farella, Braun & Martel, San Francisco, Cal., and Andrew J. Ellis, Jr., Ashland, Va., and Mays, Valentine, Davenport & Moore, Richmond, Va., on brief), for appellant in No. 15041 and appellee in No. 15042.

Before BRYAN, WINTER, and CRAVEN, Circuit Judges.

CRAVEN, Circuit Judge.

After SCM Corporation cancelled its dealership agreement with Virginia Impression Products Co. (VIP), this suit for treble damages was brought by VIP alleging that territorial and customer restrictions imposed by SCM violated the antitrust laws.[1] SCM posed a general settlement agreement between the parties as a defense, urging that it effectively released antitrust claims as well as all others, and that VIP was barred from bringing the present action. We agree.

Between September 1962 and April 1964, VIP operated as an exclusive dealer for SCM photocopy equipment in the Richmond, Virginia, area. At the same time VIP maintained exclusive dealership arrangements with at least thirteen manufacturers of other types of office equipment. As part of its sales program, SCM gave dealers like VIP exclusive territorial sales privileges for SCM photocopy products, but these dealers were prohibited from selling to customers outside the prescribed territory or to customers who were not "users." The latter provision was an attempt to keep SCM equipment out of the hands of unauthorized dealers who did not sell SCM photocopy paper. However, two machines originally delivered to VIP

---

1. *See* United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

were found in the hands of an unauthorized non-user outside VIP's sales area. SCM, believing that VIP had violated its customer and territorial restrictions, cancelled the dealership agreement. In the present action, VIP claims that SCM's sales restrictions violated the antitrust laws and that it was damaged as a result of SCM's unlawful activity.

After the cancellation of the dealership agreement, Mr. Sexton of SCM's legal department engaged a member of a Richmond law firm, Mr. George G. Freeman, Jr., to negotiate a settlement agreement. Sexton informed Freeman that he wanted a general release from VIP to insure that SCM would not later be confronted with an antitrust suit. After preliminary negotiations between VIP and SCM over financial differences were completed, Freeman drafted a proposed agreement and sent copies to Mr. Redman, president of VIP. The proposed settlement agreement contained the results of the financial negotiations and additionally contained mutual general releases. The entire agreement is set out in the margin.[2] Paragraph two of the agreement purported to release SCM "from any claim, demand, cause of action, and liability of every kind or character, known and unknown" arising from

2. SETTLEMENT AGREEMENT

Whereas, SCM Corporation, a New York corporation with its principal office in New York, N. Y. (SCM), and Virginia Impression Products Company, Incorporated, a Virginia corporation with its principal office in Richmond, Virginia (Impression Products), have had certain differences in regard to and growing out of the termination on April 8, 1964, of their Office Equipment Dealer Contract, dated December 10, 1963 (the Equipment Agreement), and the parties now desire to settle those differences.

Now, THEREFORE, SCM and Impression Products agree as follows:

1. Impression Products hereby delivers to SCM checks made payable to the order of SCM, one in the amount of $9,157.39 and dated July 31, 1964, and one in the amount of $2,000 and dated August 27, 1964. Impression Products also delivers to SCM 7 notes of Impression Products, Number 2 through 8, each dated July 27, 1964, and in the amount of $2,000, but each payable on the date indicated below:

| No. 2 | September 27, 1964 |
| No. 3 | October 27, 1964 |
| No. 4 | November 27, 1964 |
| No. 5 | December 27, 1964 |
| No. 6 | January 27, 1965 |
| No. 7 | February 27, 1965 |
| No. 8 | March 27, 1965. |

2. Impression Products hereby releases, quit-claims and discharges SCM, its successors and assigns from any claim, demand, cause of action, and liability of every kind or character, known and unknown, now existing or which may hereafter arise from the Equipment Agreement, or its cancellation, including, without limitation, the cancellation of all outstanding purchase orders, which orders Impression Products hereby withdraws.

3. SCM hereby releases, quit claims and discharges Impression Products, its successors and assigns, from any claim (including without limitation all claims for amounts due on material delivered by SCM to Impression Products), demands, cause of action, and liability of every kind of character, known and unknown, now existing or which may hereafter arise from the Equipment Agreement, or its cancellation, except as provided in Section 4 below.

4. This settlement is based on the assumption that Impression Products will pay promptly at maturity each of its notes delivered to SCM pursuant to Section 1 above and for that reason Impression Products has been given by SCM a $5,022 credit on its purchases, which represents credit of the 7% discount usually allowed only for 10-day payment; accordingly, if Impression Products defaults in the prompt payment at maturity of any such note, Impression Products shall immediately forfeit the $5,022 credit and such amount shall immediately become due and payable hereunder to SCM Impression Products.

5. This Agreement shall be governed by Virginia law.

IN WITNESS WHEREOF, each of the parties has caused these presents to be signed in its name and on its behalf by its President or Vice President, attested by its Secretary or an Assistant Secretary, both being thereto duly authrozied, [sic] all as of the 15th day of September, 1964.

the cancellation of the dealership agreement. Redman, without consulting an attorney and without seeking clarification of the terms of the agreement from anyone at SCM, signed the settlement agreement as it had been submitted to him.

In 1968 the instant action was begun by VIP. SCM set up the release given in the settlement agreement as a defense. The district court, however, found the terms of the release ambiguous, and submitted the question of the intent of the parties to the jury along with questions of mutual mistake and fraud. This appeal was taken from a general verdict in favor of VIP.

■ We think the language of the settlement agreement, especially paragraph two, is plainly a general release without ambiguity. It could hardly be plainer. The district court found an ambiguity in the "WHEREAS" clause which stated that the parties "have had certain differences" arising from the dealership termination, and that they "now desire to settle those differences." The court below read the clause as limiting the scope of the agreement to "those differences" and reasoned that if it could not be determined from the face of the document what "those differences" were, the intent of the parties presented a factual issue for the jury.

If the agreement purported to be a special release, and not a general one, such a construction might be appropriate. But the very nature of a general release is that the parties desire to settle all matters forever. A general release such as we have here not only settles enumerated specific differences, but claims "of every kind or character, known and unknown." Compare Walder v. Paramount Publix Corp., 132 F.Supp. 912, 916–917 (S.D.N.Y.1955).

■ A release is just another contract in which the intent of the parties is to be derived from the face of the instrument viewed as a whole. See Worrie v. Boze, 191 Va. 916, 62 S.E.2d 876, 880 (1951). Viewing the settlement agree-

ment as a whole, the intent of the parties to agree to mutual general releases is clear. It is significant, we think, that the release agreement recites that the specific "differences" are "in regard to and growing out of" termination of the very dealership agreement now said to have been unlawful and in violation of the antitrust laws. It is true Paragraph one sets out the terms of the agreement on accounts. Had the parties intended to limit their agreement to financial matters there recited they could have stopped there. Instead they went further. The broad language of a general release was included in the context of settling termination of the very Equipment Dealer agreement which is now the basis for claimed antitrust law violations. In such a context we must give effect to the plain meaning of words. W. F. Magann Corp. v. Virginia-Carolina Electrical Works, Inc., 203 Va. 259, 123 S.E. 2d 377, 380–381 (1962); William Schluderberg–T. J. Kurdle Co. v. Trice, 198 Va. 85, 92 S.E.2d 374, 377 (1956). See also Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F.2d 389, 394 (4th Cir. 1962).

■ We think there was no jury issue as to mutual mistake, fraud, or misrepresentation. It was clearly established at the trial that Mr. Sexton of SCM's legal department clearly desired a general release, and communicated that desire to Freeman in Richmond. There is no evidence that he ever desired anything less. For a mutual mistake to vitiate the effect of this release, both parties must have intended not to include a general release in the settlement agreement. Marshall v. Cundiff, 211 Va. 673, 180 S.E.2d 229, 232 (1971). Unilateral mistake is not enough. See DeHart v. Richfield Oil Corp., 395 F.2d 345, 348 (9th Cir. 1968).

■■ Nor can we discern any evidence whatsoever of fraud or misrepresentation of a material fact. VIP points to Sexton's desire, which was not expressed to Redman, that a general release be obtained to avoid possible antitrust litigation. The law imposes no

obligation on a party to a general release, dealing at arms length, to reveal all the possible legal theories that the other may possibly use against him. The law merely requires one to reveal material facts if they are unknown to the others. Clay v. Butler, 132 Va. 464, 112 S.E. 697, 700 (1922). Redman was not "acting under a mistake as to undisclosed material facts," Restatement of Contracts § 472 (1) (b) (1932), when he signed the agreement because he knew as well as Sexton all the material facts.[3] At most he simply failed to appreciate their significance, and failed to consult a lawyer, a dereliction not chargeable to SCM. He was not misled and indeed was encouraged by Mr. Freeman to consult his lawyer before signing the agreement.[4] Neither VIP's failure to appreciate the significance of the known facts, nor Redman's lack of expertise in the antitrust laws is sufficient to excuse VIP's compliance with the terms of the release. See Corbett v. Bonney, 202 Va. 933, 121 S.E.2d 476, 481 (1961).

 Since there were no questions of fact to be submitted to the jury, the

construction of the contract was for the court. Its meaning is clear, and we find no prohibition in the statutes or in the policy behind the antitrust laws that prohibits the disclaimer of antitrust claims by a general release. Although private enforcement is a hallmark of the antitrust laws, Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 336, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971), it is not mandatory and federal policy does not prohibit agreements among private individuals releasing such claims.

While the federal policy of jealously regarding the rights of private antitrust claimants should not as a matter of law preclude their being able to release claims—*even unknown claims*— nor protect them, after-the-fact, from their conscious though unwise action, we think it does allow—and is supported by—a rule which requires the court to determine that they *knew and intended* that the release cover all that it is being held to cover.

Novak v. General Electric Corp., 282 F. Supp. 1010, 1023 (E.D.Pa.1967) (first emphasis added).[5]

3. Significantly SCM never concealed its reason for dealership termination or pretended a fictitious one. Presumably VIP could as well have concluded at the time of signing the settlement agreement as subsequently that it was terminated "because it had sold machines to a non-user in violation of its territorial agreement and to a competitive paper seller * *" Brief for Appellee at 16.

4. Freeman encouraged Redman to seek legal advice when he submitted the proposed settlement agreement for his consideration.

September 11, 1964

Dear Mr. Redman:
In accordance with our recent conversations regarding settlement of your controversy with SCM Corporation, I enclose 4 copies of the Settlement Agreement. *After you have reviewed it with your counsel, as you have indicated you would like to do, if he has any questions, I would be delighted to consult with him.* If you find the Agreement in order, would you please execute two copies and return them to me. I will then forward them promptly to

SCM Corporation for execution and upon their return to me we could effect the settlement here in our office.

* * * * *

If I could receive your comments or the Agreement on Tuesday or Wednesday of next week we would be able to have the final settlement during the week of the 21st.

Sincerely yours,
George G. Freeman, Jr.
(emphasis added)

5. In *Novak*, Judge Higginbotham noted that
Mere shorthand references such as "general release" are not in themselves sufficient. Nor do I think that ritualistic incantations * * * are sufficient to deprive one of unknown antitrust claims. It is not too much to require the conspicuous insertion of a phrase stating that the release covers, for example, "all claims, whether presently known, or unknown, suspected or unsuspected, arising out of the same or of different product lines as are here involved and whether related or unrelated to the present dispute as to law or facts

Because we conclude that, as a matter of law, the settlement agreement expresses the intent of the parties to grant mutual general releases, the verdict rendered below will be vacated, and the complaint dismissed.

Reversed.

WINTER, Circuit Judge (dissenting):

Because I cannot conclude that, as a matter of law, the Settlement Agreement (release) executed by VIP barred the antitrust cause of action it sought to assert against SCM, I must respectfully dissent. In my view, the Court should conclude that whether the release constituted a bar was an issue properly submitted to the jury and should proceed to decide the myriad other issues that the appeals present.

My brother Craven has set forth the terms of the release. It recited that "[w]hereas" the parties have had "certain differences in regard to and growing out of the termination * * * of their Office Equipment Dealer Contract" and that they "desire to settle *those* differences," (emphasis added) and, "[t]herefore," VIP released SCM "from any claim, demand, cause of action, and liability of every kind or character, known and unknown, now existing or which may hereafter arise from the Equipment Agreement, or its cancellation. * * * *" The form of the agreement is that of a syllogism but its conclusion is a *non sequitur* because, manifestly, parties do not release and settle *certain* designated differences by releasing and settling *unknown* claims "now existing or which may *hereafter arise.*" [1] Both from the language employed and applicable authorities, I conclude that there was an ambiguity on the face of the instrument. Under the law of Virginia, the jurisdiction in which the document was executed and delivered and to which it relates, an ambiguity renders the question of whether the release should be given the effect of releasing SCM from the latter's substantial antitrust violations one for the jury after an evidentiary exploration of what the parties intended and after proper instructions from the court.[2] Greater Richmond Civic Recreation, Inc. v. A. H. Ewing's Sons, 200 Va. 593, 106 S.E.2d 595 (1959); Geoghegan Sons & Co. v. Arbuckle Bros., 139 Va. 92, 123 S.E. 387, 389 (1924) (dictum).

My conclusion that the release was sufficiently ambiguous that a reasonable jury could construe it not to be a bar here is supported by the widely-accepted common-law principle that general releases are to be construed narrowly.

or both," before we hold that *as a matter of law*, the parties *must* have intended to cover a prior unknown and unrelated claim.

Novak v. General Electric Corp., 282 F.Supp. 1010, 1023 n. 44 (E.D.Pa. 1967). *See also* Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 342–343 n. 10, 91 S.Ct. 795, 28 L.Ed. 2d 77 (1971). Compare the language in paragraph 2 of the VIP–SCM settlement agreement, *supra* note 2, which is equally explicit under the facts before us. Such a requirement, as Judge Higginbotham would impose on the release of antitrust claims, appears consistent with Virginia's construction of general releases. *See* Smith v. Hensley, 202 Va. 700, 119 S.E.2d 332, 334 (1961).

1. My conclusion would readily be to the contrary if the parties had recited in the whereas clause that they desired to settle certain differences between them as well as "any other differences of like or different nature, known or unknown, now existing or which may hereafter arise," or words of like import.

2. I hasten to add that I do not undertake to decide the antitrust issues in these appeals. Neither the majority nor I reaches them in view of the majority's decision with respect to the efficacy of the release. I refer only to the related case of Advance Business Systems & Supply Co. v. SCM Corp., 415 F.2d 55 (4th Cir. 1969), in which SCM's methods of doing business in Maryland, which were similar to the methods pursued in Virginia, were found to be in substantial violation of the antitrust laws.

Williston states that "[a] release, although general in terms, will be reformed so as to cover merely the right with regard to which the parties were dealing and exclude rights of which they were ignorant." 13 Contracts § 1551 at 188–189 (3rd ed. 1970). Virginia probably would not go as far as Williston in this direction, see Marshall v. Cundiff, 211 Va. 673, 180 S.E.2d 229 (1971), in which a release which unambiguously and emphatically covered known and unknown injuries without listing specific ones, was held effective to bar subsequently discovered injuries. But in dealing with less clear and sweeping releases, Virginia has allowed its juries considerable leeway in adopting narrow constructions. See, e. g., Smith v. Hensley, 202 Va. 700, 119 S.E.2d 332 (1961).[3] There, Hensley was a franchised dealer in Smith's "Cool Roof" roofing products. Hensley went out of business at a time when he was indebted to Smith for materials purchased. As part of the settlement of the debt, Hensley gave Smith a check on which it was noted that it was "[i]n full settlement, notes secured by deed of trust, Cool Roof matters, and all other differences." At a later date, apparently Hensley was successfully sued by users of defendant's products which had discolored and cracked. Hensley then sued to obtain reimbursement from Smith, and Smith pleaded the notation on the check as a release of the cause of action sought to be asserted. The court rejected this defense, saying:

> There is no merit in the appellants' contention that the notation on the $1,000 check barred the appellee's right as a matter of law to bring this suit. The undisputed evidence shows that the check was given to the appellants pursuant to an agreement between the parties to settle the appellee's indebtedness, and that the nota-

tion made on the check was for the purpose of relieving him of the duty to adjust future complaints arising out of the sale and application of the Stay Cool product. The settlement agreement brought to an end the dealership arrangement between the parties and all materials and equipment on hand were returned to the appellant. The evidence shows that it was not within the contemplation and intention of the parties that the notation on the check was to relieve the appellant from liability arising out of the sale to him of the Cool Roof products. For a release to be final and complete it must have been so intended by the parties. The evidence presented a factual situation for determination by the jury.

119 S.E.2d at 335. See also Mercury Ins. Co. v. Griffith, 178 Va. 9, 20, 16 S.E.2d 312, 316 (1941).

Similar cases from other jurisdictions include Vines v. General Outdoor Advertising Co., 171 F.2d 487 (2d Cir. 1948), and Walder v. Paramount Publix Corp., 132 F.Supp. 912 (S.D.N.Y.1955). In *Vines,* a salesman of outdoor advertising sued his former employer for compensation for services rendered by him. His employment contract provided that he would be paid on a commission basis. The contract also provided that the assignment of accounts to him for solicitation might be withdrawn by the employer at any time prior to an actual sale, in which event his right to compensation for work on the withdrawn accounts would cease. The plaintiff claimed, however, that the withdrawal of one of his accounts, that of Liebmann Breweries, was pursuant to a contract between his employer and Outdoor Advertising Company, Inc., which had been declared to be in violation of the antitrust laws. Plaintiff further alleged that he did not know

---

3. Resort to Virginia law at least impliedly suggests that it determines resolution of the issue of the effect to be given to the release. Although Virginia law is obviously important, there are federal consid-erations arising out of the fact that a federal cause of action, i. e., violation of the federal antitrust laws, is sought to be asserted. This point will be more fully developed in the text, *infra.*

of these facts until after his suit for compensation had been instituted. He claimed damages under the antitrust laws.

As a defense, the defendant pleaded a written release of "all claims and demands of any kind whatsoever to the date hereof, and particularly * * * any claims or demands for salary, commissions or other compensation under any employment or contract of employment * * *." The district court dismissed the complaint, but the Second Circuit (per Learned Hand, J.) reversed, saying:

> Although the plaintiff says that on April 8th, 1941, he did not know that the transfer of the Liebmann Breweries had been made in pursuance of an illegal contract between the defendant and Outdoor Advertising Co., Inc., that ignorance might not alone be enough to avoid the release, had it contained only the general words. Moreover, the fact that words of general import were followed by particular instances, did not inexorably leave no scope to the words of general import. In releases, as elsewhere, the intent of the parties is to be gathered from the instrument as a whole. Nevertheless, the courts of New York accept the common law doctrine that in a release words of general import, followed or preceded by words relating to specific claims, are, ceteris paribus, limited to the specific claims. For the present, we need say no more than that the release of April 8th, 1941, did not inevitably release claims which the plaintiff might have under the Anti-Trust Acts, of which he was ignorant at the time. (footnotes eliminated.)

171 F.2d at 492.

In *Walder*, a case strikingly similar to the one before us, the former owners of a motion picture theater sued a motion picture distributor for treble damages and an injunction under the antitrust laws; and the distributor asserted as a defense a release governed by Florida law. The court held the release legally insufficient to support summary judgment for the distributor. The essential terms of the release and the court's holding appear from the following:

> There are general clauses in the release sufficiently broad to bar the plaintiffs' present claims. However, the first "whereas" clause suggests a narrower scope. It states that the parties have had dealings and transactions relating to the "Tivoli Theatre and its equipment" and that disputes have arisen "with reference thereto and otherwise." The defendants, in addition to the general clauses rely on the words "and otherwise", but the "whereas" clause read as a whole appears to imply a more limited scope than that for which they contend. Whether the release was limited to the claims relating to equipment and repairs or was sufficiently broad to encompass all claims arising out of the operation of the theatre including antitrust violations, is not altogether clear from the face of the document. In view of this ambiguity the intention of the parties becomes relevant. Thus a substantial issue of fact exists which requires the denial of the motion for summary judgment. (footnotes eliminated.)

132 F.Supp. 916–917. See also Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F.2d 389, 394 (4th Cir. 1962) (dictum).

There is another reason to treat the release as ambiguous and to allow the jury to consider extrinsic evidence of its scope. The antitrust cause of action that VIP has sought to assert is a creation of federal law. It is Congressional policy to rely heavily upon the private attorney general concept for enforcement of the antitrust laws. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 336, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co., 381 U.S. 311, 317–318, 85 S.Ct. 1473, 14

L.Ed.2d 405 (1965). There is some authority indicating that in view of this federal policy, federal law should wholly displace state law governing release of antitrust claims. In *Zenith, supra,* the Court assumed that the question of whether the release of one antitrust defendant released his coconspirators was a matter to be determined without reference to a particular state's rules on releases. See also Dice v. Akron, Canton & Youngstown RR. Co., 342 U.S. 359, 72 S.Ct. 312, 96 L.Ed. 398 (1952) (federal law held to govern releases of claims under the F.E.L.A.). However, none of the authorities holds that federal law must be applied to govern the applicability of an antitrust release to the parties to the release where, as here, the parties contracted with reference to state law. But even if state law is not wholly displaced, federal policy has some bearing on the question. If the state law governing releases were antagonistic to the effective enforcement of private antitrust claims, for example, the interposition of a federal rule might be appropriate. See United States v. Yazell, 382 U.S. 341, 352, 86 S.Ct. 500, 15 L.Ed. 2d 404 (1966) (state interests "should be overridden by the federal court only where clear and substantial interests of the National Government, which cannot be served consistently with respect for such state interests, will suffer major damage if the state law is applied."); Novak v. General Electric Corp., 282 F. Supp. 1010 (E.D.Pa.1967) (dictum). Similarly, where, as here, the effect of state law is subject to some dispute, an interpretation of state law should be chosen which is not inimical to federal policy. Here, the federal policy in favor of private enforcement of the antitrust laws supports permitting the jury to consider extrinsic evidence and to construe the release narrowly. See, *e. g.,* Judge Higginbotham's highly persuasive opinion in *Novak, supra:*

> While the federal policy of jealously regarding the rights of private antitrust claimants should not as a matter of law preclude their being able to release claims—even unknown claims— nor protect them, after-the-fact, from their conscious though unwise action, we think it does allow—and is supported by—a rule which requires the court to determine that they *knew and intended* that the release cover all that it is being held to cover.[44] The question of the parties' intent as to the scope of the release is one of fact not readily ascertained on a motion for summary judgment; but which should be determined by the trier of fact after a full hearing. (emphasis in original.)

282 F.Supp. at p. 1023.[4]

*Vines* and *Walder, supra,* are additional support for *Novak* because, although federal policy was not an articulated basis of decision, in each of these two cases, the court looked behind broad language of release to hold that an antitrust claim was not released as a matter of law.

If I am correct that the jury was correctly permitted to consider the evidence of the intention of the parties, there is an ample record from which the jury could conclude that there was no mutual intention to release VIP's alleged antitrust claim.[5] Unilateral mistake

---

4. It should be noted that the quoted extract contains footnote 44, the text of which is set forth as footnote 5 in the majority opinion in the instant case. While the majority apparently deems the language of the release in the instant case as equally explicit as that which Judge Higginbotham indicated he would permit to operate according to its terms, I submit that it is not. In the instant case, the ambiguity arises because of the recitation of intention to settle certain designated differences followed by undesignated, unknown and future claims. This inconsistency was conspicuously absent in Judge Higginbotham's case, and hence I cannot read Judge Higginbotham to indicate that he would enforce literally the operative releasing language of the release in this case so as to preclude assertion of the antitrust claim.

5. I leave aside SCM's contention that the jury was not fairly or properly charged on this issue.

may be insufficient to avoid a contract where the language in the contract is unambiguous; but where the contract language is not clear, the absence of mutual agreement simply results in the conclusion that there was no contract. 3 Corbin on Contracts § 538, at 64–65 (1960). Moreover, the record provides an adequate explanation of what the parties mutually intended to release when they agreed to release unknown claims now existing or which may hereafter arise, so that a jury could give effect to all of the language of the release without concluding that it constituted a release of the antitrust claim or without rendering it meaningless.

Briefly stated, the record shows this: SCM intended to obtain a release of its antitrust liability. VIP did not know, and did not realize until well after the release was executed, that SCM's motive for terminating the dealership contract was its desire to enforce territorial restrictions. Hence, it could well be concluded that VIP had no intention of releasing its antitrust claim because it was not aware that it had the claim at the time that it executed the release.

On the other hand, VIP did intend to release some unknown claims. Under the equipment dealer contract, VIP was entitled to a commission on the sale of every SCM machine to be *used* in its territory, although purchased elsewhere, and, conversely, it was obliged to split commissions on SCM's machines which it sold but which were intended to be used outside of its territory. More importantly, it was obliged to honor warranties on all SCM machines *used* in its territory and not just those which it sold. Thus, at the time of settlement there may well have been unknown claims for commissions or under warranties or even for parts sold or repair work performed, presently in existence or thereafter to arise. These, it seems to me, are what were intended to be given up and not the antitrust claim, unknown to VIP, which SCM feared, but artfully refrained from making explicit when its counsel drafted the release.