**WALLACE PROCESS PIPING COMPANY, Inc.**

v.

**MARTIN-MARIETTA CORPORATION.**

Civ. A. No. 3623.

United States District Court
E. D. Virginia,
Richmond Division.

Oct. 4, 1965.

Alexander W. Neal, Jr., Battle, Neal, Harris, Minor & Williams, Richmond, Va., James T. Lewis, Arlington, Va., for plaintiff.

Eppa Hunton, IV, Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., for defendant.

BUTZNER, District Judge.

The plaintiff, Wallace Process Piping Company, Inc., seeks $168,939.48 damages for breach of contract. Wallace bases its claim upon acceleration and impact costs which it contends it incurred in performing its contract with the defendant, Martin-Marietta Corporation. The case was submitted to the Court without the intervention of a jury. The issue of damages was severed and deferred until after the question of liability was determined.

Martin entered into a contract with the United States for the performance of work in connection with the Titan missile program at Cape Kennedy, Florida. In April 1958, Martin requested bids from subcontractors for installation of the mechanical and piping systems for Complex 16, which consisted of the area from which a missile is launched, together with the supporting structures and services. Upon this contract Martin sought a fixed-price contract rather than a cost-plus contract in order to obtain improved productivity by the workers.

Wallace submitted a low bid in the amount of $198,249. It was awarded the contract on May 5, 1958, with a completion date of September 12, 1958. At the time Wallace submitted its bid, it was already working as a subcontractor at the Cape and was aware of working conditions there.

The pertinent portions of the general provisions of the contract are:

"4. CHANGES

"(a) MARTIN, through the Manager, Subcontracting, as MARTIN'S authorized representative, may at any time, by written order, and without notice to the sureties, make changes in the drawings or specifications of this contract within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for

its performance, an equitable adjustment shall be made by mutual agreement and the contract shall be modified in writing accordingly. Any claim for adjustment under this clause must be asserted within ten days from the date the change is ordered, provided, however, that MARTIN, if it determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. Nothing provided in this clause shall excuse the CONTRACTOR from proceeding with the prosecution of the work so changed.

"(b) MARTIN may order the CONTRACTOR to suspend all or any part of the work for the period of time as may be determined by him to be necessary or desirable for the convenience of the Government. Unless such suspension unreasonably delays the progress of the work and causes additional expense or loss to the CONTRACTOR, no increase in contract price will be allowed. In the case of suspension of all or any part of the work for an unreasonable length of time, causing additional expense or loss, not due to the fault or negligence of the CONTRACTOR, MARTIN shall make an equitable adjustment in the contract price, delivery schedule or both and shall modify the contract accordingly.

"5(d) Upon completion and final acceptance of all work required hereunder, the amount due the CONTRACTOR under this contract will be paid upon the presentation of a properly executed and duly certified voucher therefor, after the CONTRACTOR shall have furnished MARTIN with a release, if required, of all claims against MARTIN arising under and by virtue of this contract, other than claims, if any, as may be specifically excepted by the CONTRACTOR from the operation of the release in stated amounts to be set forth therein. If the CON-

TRACTOR'S claim to amounts payable under the contract has been assigned, a release may be required of the assignee at the option of MARTIN.

"40. PROGRESS CHARTS AND REQUIREMENTS FOR OVERTIME WORK

"(a) The CONTRACTOR shall within ten (10) days after date of commencement of work, prepare and submit for approval a practicable schedule, showing the order in which the CONTRACTOR proposes to carry on the work, the date on which he will start the several salient features (including procurement of materials, plant and equipment) and the contemplated dates for completing the same. The schedule shall be in the form of a progress chart of suitable scale to indicate the percentage of work scheduled for completion at any time. The CONTRACTOR shall enter on the chart the actual progress at the end of each week and shall immediately deliver to MARTIN three copies thereof.

"(b) The CONTRACTOR shall furnish sufficient forces, construction plant and equipment, and shall work such hours, including night shifts and overtime operations, as may be necessary to insure the performance of the work in accordance with the approved progress schedule. If, in the judgment of MARTIN, the CONTRACTOR falls behind the progress schedule, the CONTRACTOR shall take such steps as may be necessary to improve his progress, and MARTIN may require him to increase the number of shifts, and/or the amount of construction plant. This shall be at no additional cost to Martin."

During the time that this contract was performed, the United States was on a crash program to develop its missile bases. Technology of missiles and bases was advancing rapidly and concurrently with the construction of the base. Much of the work resembled a research and de-

velopment project. This necessitated many changes in the contract. At times the changes were ordered before plans and specifications were completed. During the performance of the contract, Martin issued fifty-five change orders, which increased the price from $198,249 to $615,317.19. Three days after the contract was let, all plans and specifications were replaced. The last change order was issued April 10, 1959.

Upon receipt of a change order, Wallace submitted a proposal to Martin for the cost of the work or the credit which should be allowed. Martin then considered the proposal and either accepted it or called for further negotiation. If necessary, representatives of Martin and Wallace met at the site of the work. Wallace later would submit one or more revised proposals until the parties agreed upon the amount which should be paid or credited for the work. Agreement was often reached after the work required by the change was completed. This sum was then incorporated into a contract amendment. Each amendment consisted of a number of change orders. A summary of the original contract and the amendments follows:

| Amendment Number | Change Orders | Execution Date | Completion Date | Total Fixed Price |
|---|---|---|---|---|
| Original contract | | May 5, 1958 | Sept. 12, 1958 | $198,249.00 |
| 1 | 1, 2, 4, 6, 7, 9, 10 | Aug. 19, 1958 | Sept. 12, 1958 | $271,740.91 |
| 2 | 3, 5, 11–19 | Feb. 11, 1959 | Feb. 2, 1959 | $403,070.93 |
| 3 | 20–33, 35–39, 43 | Apr. 29, 1959 | May 3, 1959 | $465,995.25 |
| 4 | 8, 40–42, 45–52 | May 15, 1959 | May 13, 1959 | $482,961.57 |
| 5 | 34, 44, 53–55 | May 27, 1959 | May 13, 1959 | $615,317.19 |

Each change order was transmitted by a form letter which stated that the change was not expected to affect the completion date, but Wallace was to indicate whether it believed the time schedule should be changed. Wallace on August 27, 1958 requested an extension of sixty days in the completion date which was granted. This was the only written request for an extension, although Wallace did ask informally for extension which was denied. In November 1958 a completion date of February 28, 1959 was set.

Wallace did not keep a schedule required by paragraph 40(a). In view of the changes in the work such a schedule would have been difficult to maintain. Martin never requested the schedule from Wallace. Representatives of Martin met with the subcontractors including Wallace daily and informally programed the work. Starting in July 1958 Wallace from time to time fell behind the program. In November 1958, however, it had completed 93% of the work on the original contract. After December 1, 1958 approximately thirty change orders were issued which substantially increased the work. Wallace was unable to complete the work on February 28, 1959. By amendments to the contract the completion date was extended to May 13, 1959. Wallace's work was substantially completed by April 29, 1959.

The original contract was bid on the basis of a sixty-hour work week. On October 31, 1958, Martin directed Wallace to proceed on a fifty-hour work week. Wallace complied and Martin was allowed a credit on the contract price for the modification because reduction from

sixty hours to fifty hours reduced costs. After the reduction in hours, the cost of all change orders was figured on the basis of fifty hours. Both parties, of course, were aware of this, and Wallace specifically called it to Martin's attention by letter dated January 8, 1959.

In January 1959 Martin was still aiming for the February 28, 1959 completion date. Wallace, however, was behind schedule. Its failure to meet its schedule was due primarily to difficulty in getting full production from its labor. This was a responsibility of Wallace. It was not caused by Martin. Meetings were held by representatives of Wallace and Martin to arrange to have the work proceed on schedule. In early February 1959 Martin instructed Wallace to increase its work force and hours. On February 23, 1959, Martin wrote Wallace:

"During the course of a series of meetings between you, your representatives, and representatives of both Martin Subcontracting and Engineering, over a period of approximately ten days, starting 30 January 1959, we received assurances that your company would immediately sufficiently man this job to meet the 28 February 1959 deadline agreed upon.

"These assurances were asked in view of past failures on the part of your company to meet previous work schedules, due to certain in house problems which we now understand have been resolved.

"Your attention is directed to Section 40, Paragraph 'B' of the General Provisions of this Contract in connection with which we reiterate our understanding that this work is to be accomplished at no additional cost to Martin."

In response Wallace wrote Martin on February 26, 1959:

"Kindly be advised, that we are cognizant of the facts, that led up to your directing us to complete the work on an accelerated schedule, as outlined in the last paragraph of your aforementioned letter, but we also wish to call to your attention, that we at the time of agreeing to this accelerated schedule, received verbal assurances from you, that it did not preclude entirely, the possibility, that we may have a just claim under the contract (General Provisions) terms for an increase in contract price.

"Please be advised, that in view of the above, we can not concur with your statement, relative to Section 40, Paragraph 'B' of the General Provisions, of this contract, that we are 100% responsible, for all additional cost incurred to us, for completing the work, above our normal 50 hr. work week, and we intend to present to you upon the contracts completion our claim for an increase in contract price as previously mentioned above, under Section 4, Paragraph (a) and (b) of the General Provisions of the contract covering equitable adjustments, etc."

Martin replied to this letter on March 10, 1959:

"In regard to the second paragraph of the referenced letter it was agreed that, if you felt so inclined, it was your prerogative to assert a claim and, if such assertion were made, it would receive due consideration by Martin. However, the discussions mentioned did not infer that a justifiable claim existed.

"In our opinion, any such claim would not be based on changes in the work to be performed, but rather on a determination of whether the accelerated effort on your part, in order to maintain progress and overcome your schedule slippage, was entirely due to the conditions set forth in Section 40, Paragraph (b) of the General Provisions of the subject contract."

Representatives of the parties had several meetings and telephone conversations concerning costs in the Spring of 1959. No definite agreement, however, was reached. The cost of the

change orders was computed on the basis of a fifty-hour week and on this basis was incorporated by Amendments 3, 4 and 5 into the contract. These amendments were made after the work substantially had been completed.

The final amendment to the contract is #5, which was dated May 27, 1959 and provided in part:

"Clause (4) (A) as amended will now read:

"(4) (A) The total amount the CONTRACTOR may receive for the performance of the work hereunder is the lump sum of Six Hundred Fifteen Thousand Three Hundred Seventeen Dollars and Nineteen Cents ($615,317.19). MARTIN shall pay CONTRACTOR for the work to be performed under Item I in accordance with Clause (4) (A) of the original contract. Payments for additional items will be in accordance with the provisions of Clause (5) of the General Provisions of this contract.

"ALL OTHER terms and conditions of this contract, except those specifically changed herein by this Amendment, remains the same."

Wallace submitted an invoice to Martin on June 8, 1959 for the amount due on the contract. No mention was made of any acceleration and impact claim at that time. On July 2, 1959 Wallace submitted a revised claim for missile firing. No mention was made at this time of the acceleration and impact claim. Throughout this time, however, there was an outstanding claim relating to Florida state taxes, which was not mentioned in the final amendment or in the letter of July 2, 1959. The failure to mention the impact and acceleration claim does not conclusively establish that Wallace was not pressing it.

On September 30, 1959, Martin wrote Wallace that it would pay certain sums for the Titan missile firings and retainage, and added:

"In the interest of closing out this contract, if you will agree not to make any further monetary claims of any kind against the contract, we will prepare an amendment to the contract for the above amount and submit it to the Air Force for approval."

Wallace declined this offer.

Wallace presented its impact and acceleration claim in an undated letter received by Martin on September 26, 1961.

On August 27, 1962, Martin denied all liability for the Titan missile firings, but agreed that if Wallace would furnish a properly executed release, Martin would pay the $10,000 retainage. Wallace executed the release as required by Martin and as a term of the release expressly excepted:

"* * *. Claim for increased costs due to acceleration of work, impact and suspension of work in the amount of $178,939.48."

Acceleration and impact costs have been recognized in determining equitable adjustments in government contracts. Perhaps the clearest description of these costs and consequently of the nature of Wallace's claim is found in the Comptroller General's Report to the Congress entitled "Review of the Administration of Construction of Certain Launch Facilities for the Atlas and Titan Intercontinental Ballistic Missiles at Selected Air Force Bases (January 1963)", in footnotes on pages 31 and 32:

"Acceleration costs are described as those additional costs incurred by a contractor to overcome excusable delays, including those caused by the addition of extensive modifications work, within the time limits originally established in the contract to meet the relatively inflexible completion dates set by the Air Force. Acceleration costs paid for multiple shift operations, and other increased operating expenses related to performance of the work on an accelerated time schedule.

"Impact costs are described as those increased costs attributed to the cumulative effect of numerous

modifications on one another and upon the original contract work and to the resultant disruptions and inefficiencies introduced into a contractor's construction operations."

■ Acceleration and impact costs have been allowed by the Armed Services Board of Contract Appeals. E. g., Hagstrom Construction Co., ASBCA No. 5698, 61–1 B.C.A. ¶ 3090; Conn Structors, ASBCA No. 5195, 60–1 B.C.A. ¶ 2627. These cases are instructive because of their analysis of the nature of acceleration and impact costs. They are not, however, controlling. Each concerns a claim by a contractor against the United States. The contracting officer denied that the claims and the issue before the Board concerned the propriety of his determination. The cases are not concerned with the issue of whether the parties had agreed upon the contract price. A case involving this issue before the Board is Tenny Engineering, Inc., ASBCA No. 7352, 1962 B.C.A. ¶ 3471. To resolve this issue the Board applied ordinary principles of contract law to determine whether the government's defense of accord and satisfaction was applicable. The case demonstrates that claims for equitable adjustments are not removed from the general principles of law relating to contracts. The law of Florida governs this case.

Wallace seeks recovery of its total costs, plus a reasonable profit, less the amount already paid it. In support of the total cost theory of recovery Wallace cites the Comptroller General's report, "Review of the Administration of Construction of Certain Launch Facilities for the Atlas and Titan Intercontinental Ballistic Missiles at Selected Air Force Bases, (January 1963)", page 2:

> "Our review of selected contracts for construction of launch facilities at Warren, Forbes, and Lowry Air Force Bases disclosed, that although the contracts were awarded at fixed prices after competition had been obtained through formal advertising procedures, the initial specifications provided by the Air Force were so incomplete and inadequate, and the requirements were modified so frequently and to such an extent, that ultimately it was necessary for the Corps of Engineers to abandon the fixed prices and to negotiate final contract prices on the basis of total costs claimed by the contractors for the work performed. * * *."

The illustration, however, is not persuasive. While the parties to a contract may agree to modify their undertaking, the same latitude is not allowed a court.

Wallace is not entitled to the recovery it seeks (except for two items which will be considered later) for the following reasons.

Among the elements of its claim is 10% profit in the amount of $68,853.56. By letter dated October 2, 1958, however, Wallace claimed a 7% profit margin on change orders. Martin allowed this factor and no evidence has been presented supporting a 10% allowance.

■ Wallace's theory would require the Court to change the contract to which the parties subscribed from a fixed cost contract to a cost plus fee contract. This theory would require Martin to bear the full cost of material regardless of the fact that it was Wallace's responsibility to procure materials. Wallace, without control from Martin other than through plans and specifications, selected brands, purchased materials and arranged shipment. If Wallace paid too much, it should bear the cost. If it could buy more cheaply than the prices reflected in the computation of the bid and change orders, it is entitled to the benefit. In no event did the parties contract that the cost of procurement should be thrust on Martin. Had they done so, it is entirely possible that Martin would have exercised control or supervision over purchasing and shipping.

Several factors caused delay in construction. Wallace had frequent change of supervision on the job. Its supervisors also had responsibility for two other Wallace projects and consequently their attention was divided. Wallace had labor difficulties with its own men. Low

productivity of labor at Cape Kennedy was not unusual during the time this contract was executed. Productivity was further decreased by unauthorized work stoppages. Wallace also substituted Pacific valves for Annin valves. The substitution was authorized by the contract, but it did cause delay. The multiplicity and complexity of change orders also caused delay.

■ Excess labor costs resulting from disruption caused by numerous change orders has been recognized as the basis for an allowable claim. See Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F.2d 389, 394 (4th Cir. 1962). Acceleration and impact costs are allowable, however, only for efforts to overcome excusable delays. Wallace has not established by a preponderance of the evidence that the direction to accelerate and the impact of the change orders were the sole cause, or even the primary cause for costs in excess of those for which it has already received compensation. Wallace's theory of the case would require Martin to assume all labor costs including those for which Wallace was responsible.

■ Martin is liable for two items. The first is Wallace's claim resulting from Titan missile firings. During the later stages of the contract Martin occasionally directed Wallace to suspend work for the convenience of the government so that test firings of the Titan missile might be made. Martin recognized that Wallace was entitled to compensation for its loss occasioned by such delays. Prior to execution of the final amendments to the contract Wallace had submitted a proposal for its costs in connection with such delays. Martin had returned the proposal for resubmittal, and both Wallace and Martin understood that that matter was outstanding at the time of execution of the final amendment. The parties are in accord on the question of Martin's liability for this claim. They have not agreed on the amount of damages. Martin has paid into the registry of the Court the amount of damages which it has computed.

■ The second item for which Martin is liable is overtime or premium pay starting with the payroll period which ended February 17, 1959. This date has been selected because it was during a series of meetings in the first ten days of February that Martin gave Wallace an order to accelerate the work to meet the February 28, 1959 deadline.

Originally the contract had been bid on the basis of a 60-hour week. This was changed to a 50-hour week in accordance with directions received from Martin on October 31, 1958. Thereafter all change orders were negotiated on the basis of a 50-hour week.

In response to Martin's acceleration order given in the early part of February and its letter concerning this directive dated February 23, 1959, Wallace specifically noted its intention to base a claim for completing work above a 50-hour work week by its letter of February 26, 1959. This letter does not refer to increase in material and labor costs in general. It is limited to an intended claim for additional costs for completing the work above the 50-hour normal work week. It fairly and fully stated to Martin the basis of Wallace's claim. Martin acknowledged the letter on March 10, 1959, recognizing that it was Wallace's prerogative to assert such a claim, but denying any inference that the claim was justified.

Ten change orders issued by Martin in December, which were finally priced at $52,350.79, and a change order issued on January 2, 1959, which was finally priced in May at $110,643.65, followed by change orders in February materially increased the amount of work which Wallace was expected to accomplish by February 28. The Court finds that these change orders required Wallace to work its men over a 50-hour normal work week. Nevertheless, these change orders were priced on the basis of a 50-hour work week and Martin has denied the claim for premium or overtime work.

■ The order to complete additional work without an extension of time, which made necessary a work week in excess of

50 hours, was a change within the meaning of paragraph 4, the change clause of the contract. The refusal of Martin upon demand timely made by Wallace for an equitable adjustment constituted a breach of contract. Western Contracting Corp. v. United States, 144 Ct.Cl. 318, 333 (1958).

█ To all claims (except the Titan missile firings) Martin has asserted the defense of the parole evidence rule. With respect to the claim for overtime or premium work, this defense is not applicable.

In Gulf Atlantic Towing Corporation v. Dickerson, Inc., 271 F.2d 542, 545 (5th Cir. 1959) the Court quoted the Florida rule on parole evidence:

" 'The Supreme Court of Florida has had occasion to declare the general rule. It has held that when the parties have reduced their agreement to writing the intent so expressed is controlling and all other utterances are immaterial with respect to the matters embraced. [Milton v. Burton, 79 Fla. 266, 84 So. 147].'

"Of course, in order for this rule to apply, it must be found that 'the written instrument appears on its face to express an agreement complete in all essential terms,' * * ."

Martin contends that Amendment number 5 dated May 27, 1959 merged into it all of the negotiations between the parties on the change orders.

The difficulty with Martin's position is that Amendment 5 does not make the sum of $615,317.19 the final amount to which Wallace is entitled. It specifically provides "Payments for additional items will be in accordance with the provisions of Clause 5 of the General Provisions of this contract." The pertinent part of Clause 5 to which reference is made has been set out in this memorandum. It contemplated final payment upon execution of a release of all claims other than those excepted by the contractor. The language of Amendment 5 and Clause 5(d) is clear and unequivocal. It

must be given effect by the Court. Wallace in February gave timely notice of its intention to claim costs of overtime pay at the contract's completion. Amendment 5 recognized additional items could be outstanding. In accordance with Clause 5(d) the final release excepted impact and acceleration claims which included costs for overtime.

In Jacksonville Paper Co. v. Smith & Winchester Mfg. Co., 147 Fla. 311, 2 So. 2d 890, 892 (1941) the Court said:

" * * *. The rule is that negotiations before the execution of a contract are absorbed in it. Ross v. Savage, et al., 66 Fla. 106, 63 So. 148. Of course, this does not apply if there is uncertainty as to the extent of the undertaking, or if the whole transaction or some vital element of it is not incorporated. Milton v. Burton, 79 Fla. 266, 84 So. 147."

The principles expressed in Gulf Atlantic Towing Corporation v. Dickerson, Inc., 271 F.2d 542, 545 (5th Cir. 1959) and Jacksonville Paper Co. v. Smith & Winchester Mfg. Co., 147 Fla. 311, 2 So. 2d 890, 892 (1941) make the parole evidence rule inapplicable with respect to overtime pay.

█ The agreements reached by the parties in amending the contract precludes Wallace's claim for costs of material, labor (other than the overtime pay), overhead and profit. All costs were known to Wallace or could have been known before the final amendment. It is no answer that the amendment simply incorporated the change orders. Work was substantially completed on April 29, 1959. Many of the change orders were not finally negotiated until long after that date; for example, change order 34, issued January 2, 1959 was not finally priced until after May 18, 1959 when Wallace submitted its proposal for $110,-643.65. Moreover, if Wallace did not have all of its cost figures in hand, nothing compelled it to negotiate for its compensation until it computed its costs. Martin did not require final agreement of the cost of a change before Wallace un-

dertook the work specified in the change order.

The claim concerning the overtime pay differs from the claim for other items in two respects. First, Wallace specifically gave notice of its intention to press its claim for overtime. This was conditionally expressed in Wallace's letter of January 8, 1959, and unconditionally stated in its letter of February 26. Wallace, however, did not give explicit notice that it would claim additional sums for labor, material, overhead and profit at the time it priced the change orders and executed the amendments. Second, of greater significance is the fact that Wallace after receiving the acceleration order was required to compute its labor costs on the artificial basis of a 50-hour week because of Martin's directive of October 31, 1958. In contrast Wallace was under no compulsion to negotiate for its compensation for other items before its costs were ascertained.

■ Wallace seeks interest from May 5, 1959. Its claim, however, was not definitely stated until September 1961. The contract provided for monthly invoices to be paid within thirty days after receipt and acceptance. The Court is of the opinion that interest should start November 1, 1961, which is approximately thirty days after Wallace's claim letter. Martin paid into the registry of the Court $4,014.80. A credit should be allowed for interest on the sum deposited in the registry, computed from October 13, 1964, the day it was deposited.

■ Wallace also seeks attorneys' fees. In support of its position it cites several cases before the Armed Services Board, including Lake Union Dry Dock Co., ASBCA No. 3073 59-1 B.C.A. ¶ 2229. The fact that the Armed Services Board has considered attorneys' fees as an element of overhead expense in contracts in which the government is a party, does not furnish precedent for the allowance of fees in a controversy between private corporations. No evidence has been presented that the parties contracted for the payment of attorneys' fees, and no authority has been cited au-

thorizing such payment in a simple breach of contract case.

Ordinarily, attorneys' fees should not be allowed unless fixed by statute. They have been allowed in suits in equity and admiralty in exceptional circumstances based primarily upon the duty owed by the defendant to the plaintiff arising out of the relationship of the parties. Cf. Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); Bell v. School Board of Powhatan County, Virginia, 321 F.2d 494 (4th Cir. 1963); Rolax v. Atlantic Coast Line R. Co., 186 F.2d 473 (4th Cir. 1951). Equitable reasons justifying the allowance of attorneys' fees in those cases are not present in the action before the Court. Here, although Wallace seeks an "equitable adjustment" of the compensation paid it for its work, the action is in reality based on a breach of contract by parties who have negotiated at arms length. Under these circumstances the allowance of attorneys' fees is not proper either as costs or damages.

The Court concludes:

The agreement made and amended by the parties was a fixed cost contract;

Wallace is not entitled to have the fixed cost contract, as amended, converted directed or indirectly into a cost plus fee contract;

Wallace is not entitled to recover its total costs, plus a reasonable profit, less the amount already paid.

Martin's defense of the parole evidence rule is not applicable to the claim for overtime.

Wallace is entitled to recover its damages for the Titan missile firings.

Wallace is entitled to recover overtime or premium pay starting with the work period which ended February 17, 1959 and ending with the completion of the work.

Wallace is entitled to interest on the amount of these damages at the rate of 6% per annum starting November 1, 1961 until paid, subject to a credit for interest on the sum deposited by Martin in the registry of this Court, com-

puted from the day it was deposited.

Wallace is not entitled to recover any other damages. The agreements reached by the parties in the original contract, in pricing the change orders and in executing amendments constitute a binding contract between the parties with respect to all compensation except for overtime and costs incurred by Titan missile firings.

Wallace is not entitled to recover attorney fees, but having substantially prevailed it is entitled to its costs.

Counsel are requested to confer to determine whether damages can be stipulated. Each party can reserve its position on liability in the damage stipulation if it be so advised.

If the parties can not stipulate damages, this issue will be set for hearing.

A final order will not be entered until the amount of damages is ascertained.