**CLARKE BARIDON, INC., Appellee and Cross-Appellant,**

v.

**MERRITT–CHAPMAN & SCOTT CORPORATION, Appellant and Cross-Appellee.**

**No. 8605.**

United States Court of Appeals Fourth Circuit.

Argued June 11, 1962.

Decided Dec. 28, 1962.

7.

Forbes W. Blair, Washington, D. C. (Harold E. Mott, and Welch, Mott & Morgan, Washington, D. C., on the brief) for appellee and cross-appellant.

Ralph L. Ellis, New York City and Alexander Harvey, II, Baltimore, Md. (Manning, Hollinger & Shea, New York City, and Ober, Williams, Grimes & Stinson, Baltimore, Md., on the brief) for appellant and cross-appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

A second-tier subcontractor sought additional compensation from the first-tier subcontractor arising out of work performed on the Truax Air Force Base at Madison, Wisconsin, and at Fort Custer, Michigan. The District Judge allowed some claims, allowed others in part and denied still others. The defendant has appealed from the partial allowance of certain of the claims, while the plaintiff has cross-appealed from the denial of others.

The United States employed Western Electric Company to design and construct buildings and other facilities at certain military bases for use as part of the Semi Automatic Ground Environment System (SAGE). Later Western entered into fixed price contracts with Merritt-Chapman & Scott Corporation for the actual construction of the buildings and facilities at Truax Air Force Base and at Fort Custer. Merritt, the first-tier subcontractor, the defendant here, in turn entered into a contract with Clarke Baridon, Inc., a second-tier subcontractor and plaintiff here, for the insulation of pipes and duct work at Truax and at Fort Custer. Baridon's insulation contract for Truax was for a fixed price of $159,000, while its insulation contract for Fort Custer was on a fixed price basis of $99,000.

Commencement of the work at Truax was delayed by soil conditions necessitating additional excavation, a delay in the driving of piles and by a strike. It was prolonged and complicated by a large number of change orders amounting to approximately thirty per cent of the original contract price. Change orders are expected by contractors such as Merritt and Baridon, though the record indicates that the value of change orders usually does not exceed ten per cent of the contract price, and provision was made for compensation to Baridon to the extent that direct change orders im-

posed additional cost upon it. With respect to the work at each place, therefore, Baridon has been paid the original contract price increased by compensation attributable to change orders directed to it. Additionally, it has received certain other sums on account of increased costs at Truax, such as $6,464.21 paid to it on account of increased board expense of its employees working upon that project. In addition to all of that, Baridon submitted claims for additional compensation at Truax aggregating $81,952.81 and another claim on account of an alleged "excess labor" cost which it finally evaluated at $24,239.75, making a total claim of $106,192.56 [1] at Truax. It filed two claims aggregating $9,992.02 for additional compensation in connection with the work at Fort Custer.

Generally, Baridon's claims for additional compensation on account of increased costs were submitted by Merritt to Western with recommendations that they be accepted. Western investigated the claims and allowed the Truax claims to the extent of $26,467.70. On account of these claims, Merritt has actually paid to Baridon the sum of $31,412.75.

The District Court found that Baridon was entitled to additional compensation at Truax in the amount of $1,824.95 for increased labor costs, $2,562.45 for material cost increases, $16,940 on account of board expense for nonresident labor, that amount being in addition to the amounts previously paid on that account, $4,344.45 for overtime work costs, $12,000 for excess labor, $1,895.84 for the insulation of hubs at Truax, $879.75 for payroll taxes, insurance costs and overhead on the overtime pay claims, and $8,805.81 for overhead and profit on the other items. After crediting Merritt with the $31,412.75 previously paid, the District Court allowed prejudgment interest of $8,640.50 computed at the rate of six per cent per annum upon the net balance which it found to be due. Accordingly, it entered judgment for the plaintiff in the sum of $22,479.03.

I

Baridon has appealed from so much of the judgment below as denied it recovery on its claim of $13,653.42 for the installation of brattice cloth at Truax, its claim of $6,182.73 for the use of wire mesh at Truax, its claim of $8,973.12 for the installation of brattice cloth at Fort Custer, and its claim of $1,018.90 for the insulation of hubs at Fort Custer.

A

BRATTICE CLOTH AT TRUAX

Western's contract with Merritt was based upon Merritt's bid, with respect to the insulation of duct work, of 70¢ per square foot for both exposed and unexposed duct with an additional charge of 40¢ per square foot for surfaces finished with plaster. It invited bids from insulation contractors on the basis of the same categories. It originally received from Baridon a bid which, to the extent here relevant, provided:

| | *Flat Surface Per Sq. Ft.* | *Curved Surface Per Sq. Ft.* |
|---|---|---|
| For Concealed Duct Work | $.58 | $.66 |
| For Exposed Duct Work | .54 | .62 |
| For Plastered Finish Surfaces | .66 | .70 |
| Brattice Cloth Finish | .66 | .70 |

Merritt declined to accept this bid, reporting that it had no unit price for brattice cloth from Western. Merritt insisted that the categories fixed by Western be accepted by Baridon, and presumably by other bidders for the insulation subcontract. Though the specifications plainly provided that, when the insulation coating on exposed duct work is still wet, a layer of brattice cloth should be embedded in it and given a finish-coat of white insulation coating, Baridon did not change its bid of 54¢ and 62¢ on the exposed duct work, but deleted the special item of brattice cloth

1. When the complaint was filed, this figure had risen to $115,742.54.

from its bid. It did so with the understanding that Merritt would attempt to obtain a special unit price for brattice cloth from Western, but Merritt was unsuccessful in that endeavor.

Brattice cloth is a heavy, loosely woven cotton fabric filled with a flame resistant material. To finish duct insulation with brattice cloth is approximately as expensive as to finish it with plaster, but, because Baridon bid less for exposed duct work, though the specifications required brattice cloth on all such duct work, at a lower sum than for plaster finish, it claimed additional compensation of $13,653.42 on account of brattice cloth installed at Truax.

In denying this claim, the District Court referred to the testimony of Clarke Baridon:

> "The wording was very ambiguous. When we came back on the thing, they said, 'We have already submitted the unit prices that are in our schedule to Western Electric. You will have to accept those figures.' In other words, we were boxed. We had a choice of forgetting the whole contract or leave it go."

On appeal, Baridon contends that this testimonial statement related to additional charges of ten per cent for overhead and ten per cent for profit, to which Mr. Baridon had referred immediately before the quoted statement. However, it is plain from the testimony of both Clarke Baridon and Richard Baridon that they were informed before the contract was entered into that the bidding had to be based upon one unit price for exposed duct work without any separate price for brattice cloth finish. Baridon could have increased its unit prices for exposed duct work or it could have withdrawn from the bidding. When it chose to do neither and thereafter entered into a formal contract based upon its quoted unit prices, there is no basis for a claim that it misinterpreted the invitation or that it inadvertently omitted a unit price for brattice cloth.

### B

### Wire Mesh at Truax

During the course of the work at Truax a dispute arose as to whether or not reinforcing wire mesh, loosely woven wire comparable to chicken wire, was required on duct work which was to be finished with plaster. The specifications provided only that the plaster was to be applied in a manner recommended by the manufacturer of the insulation and approved by Western. Western insisted that wire mesh was required, while Baridon contended that the manufacturer's recommendations did not require it, and that wire mesh was used only when the specifications expressly called for it. There followed correspondence and conferences between Merritt and Baridon about the matter, and these culminated in a letter of May 15, 1957, from Merritt to Baridon in which Merritt agreed that the architects should have been more explicit in the specifications, but purported to confirm an oral agreement by Clarke Baridon that wire mesh would be used in connection with plaster finishes at no expense to Merritt. Thereafter, Baridon used the wire mesh where the insulation on the duct work was to receive a plaster finish, but Clarke Baridon testified that he did so under protest. He testified that his verbal protest was to some unidentified representative of Merritt and that he could not recall the identity of the person.

Baridon acknowledges that it received Merritt's letter of May 31, 1957. When that letter purported to confirm an oral agreement completely settling this issue, something more was called for if Baridon disputed the agreement or its extent. Unsupported assertion of some verbal protest to some unidentified person is not enough. At least, the District Judge was abundantly justified in finding that there was an agreement as outlined in and confirmed by Merritt's letter of May 31, 1957.

C

THE FORT CUSTER CLAIMS

What has been said with respect to the brattice cloth claim at Truax is sufficient to dispose of the brattice cloth claim at Fort Custer.

The other claim at Fort Custer was for the insulation of hubs. It was in the amount of $1,018.90, and arose out of a substitution of larger cast iron hubs for smaller ones of wrought iron. The District Court thought that claim would be allowable but for a release which Baridon had signed.

While Baridon's claims for additional compensation for brattice cloth and hub insulation at Fort Custer were pending, it had a final settlement with Merritt. Baridon thereupon executed and delivered to Merritt a release of Merritt from all claims arising out of the work at Fort Custer. This release provided, however, that, "Any settlement that is obtained of the subcontractor's outstanding claims with regard to Brattice Cloth or installation (sic) of Hubs on bulletin 317 will accrue to the benefit of the subcontractor."

Merritt had submitted these two Baridon claims to Western with recommendations that they be accepted by Western. Under the circumstances, the plain intention of the release was to preserve Baridon's claims against Merritt to the extent, but only to the extent, that Merritt obtained some allowance upon them from Western. Western declined both claims in full, and Merritt has never received anything from Western on their account.

██ Baridon seeks to avoid the release by introduction of the principle that words of general import in a release, when followed by reference to specific claims, are to be ignored, the release being effective only to the extent that it is specific. If the principle were applicable here, the release would be wholly ineffective as to any claim by Baridon other than those relating to brattice cloth or insulation of hubs, for no other claims were mentioned. The principle, of course, is inapplicable because, obviously, the parties did intend to settle all other matters than the two mentioned and to preserve those only to the extent of requiring Merritt to pay over to Baridon whatever it could obtain from Western on the basis of those two claims.

Resort to the asserted principle is appropriate for the purpose of restricting the effect of a release to the actual intention of the parties. It cannot be invoked for the purpose of thwarting their evident intention.

D

CONCLUSION

For the foregoing reasons, we think the District Court quite properly disposed of the matters which form the basis of Baridon's appeal.

II

Merritt has appealed from so much of the judgment as awarded Baridon $12,000 on account of "excess labor," awarded Baridon profit on four items and awarded Baridon prejudgment interest at six per cent per annum on the net balance found due.

A

CLAIM FOR EXCESS LABOR

Baridon claimed that the delay in the work at Truax and the excessive number of change orders greatly increased its labor cost. As a result of the delay, it says that it was unable to use local labor, some of which had been available earlier, and that the "travelers" it was forced to employ were not as efficient as asbestos workers resident in Madison. It further contended that its employment of its labor force was made inefficient because of the excessive number of change orders directed to others as well as to it. While it has been compensated for the work done by it under the change orders, it says that its work at Truax was disrupted by change orders directed to piping contractors and others. It suggests, illustratively, if the piping contractor was directed to relocate pipe which had been installed and was ready for coverage, the change order to the piping con-

tractor disrupted Baridon's work schedules and imposed damage upon it if it had scheduled work upon the pipes subject to the change order and was then forced to find other work upon which its labor force could be employed.

The District Court was not impressed with the first basis of this claim for there were only 25 asbestos workers in the Madison area. They usually worked for local contractors, and Baridon required more than that number. While there was evidence that some of the 25 local asbestos workers would have been available for a time had the work commenced on schedule, it was apparent that Baridon was principally dependent upon other sources for its labor force at Truax. Baridon made no effort to bring any of its regular employees to work at Truax, and the District Court was of the opinion that there was no satisfactory showing of the quality of Baridon's supervision there or of the actual efficiency of the men actually employed there by it. Moreover, because of the more complicated work at Truax, the District Court was unimpressed with Baridon's comparisons of the ratios of labor costs to material costs at Truax and at Fort Custer, upon the basis of which Baridon computed its claim on this score of $24,-239.75.

The District Court found, however, that some additional labor costs had been imposed upon Baridon "principally because it was not possible to utilize the labor as efficiently as it could have been utilized under normal circumstances." In light of its other findings, the basis of this ultimate finding appears to have been disruption of the work because of the unexpected and excessive number of change orders. The testimony readily supports the finding that the excessive number of change orders would militate against efficient employment of the labor force with some resulting increase in labor costs.

The District Court concluded that increased labor costs of $12,000 had been incurred by Baridon. On appeal, Merritt contends that the construction contract forecloses the excess labor claim and, alternatively, that the amount of the damages is too speculative for allowance.

In the contract between Merritt and Baridon, Article 6(b), quoted in the margin,[2] provided, in effect, that any determination or decision between Merritt and Western shall be binding upon Merritt and Baridon to the extent that the matter in dispute between Merritt and Baridon is involved in the determination as between Western and Merritt. Article 4, to which reference is made in Article 6(b), obligated Baridon to honor all change orders but limited its right of additional compensation on account of such change orders unless it made a claim of it within a specified time, a limitation which Merritt waived, and unless the amount of additional compensation was determined by written agreement in advance.

The apparent purpose and the effect of Article 6(b) of the contract was to limit Baridon's right to additional compensation to the amounts which Merritt could collect from Western when the two claims were entirely coextensive and derivative. Change orders, for instance, were directed by Western to Merritt on the basis of which Merritt, where necessary, transmitted them or issued its own change orders to its subcontractors. When, as a result of such change orders, Baridon was entitled to additional compensation by Merritt, Merritt had an equal and

2. "6(b) Any findings, agreement, determination or decision which may be made as between Contractor and the Owner shall be binding upon the parties hereto, and in any dispute or question arising between the parties hereto, shall be determinative of the same insofar as and to the extent that said finding, agreement, determination or decision concerns the same matter or matters in dispute or in question between the parties hereto, except that such part of any finding, agreement, determination or decision as involves compensation from the Owner to Contractor shall bind the parties hereto in the manner provided for the adjustment of compensation under Article 4."

coextensive right of additional compensation by Western. It is perfectly clear if a Western change order increased the cost of the work to Baridon, it increased the cost of the work to the same extent to Merritt.

As we have noted, Baridon's claim for excess labor costs was transmitted by Merritt to Western with a recommendation that it be allowed. The consequence of the allowance, of course, would have been that Western would have paid the amount allowed to Merritt, and Merritt, in turn, would have paid the allowed amount to Baridon. Though Western did allow something on Baridon's claim for "increased cost of labor," it did not allow anything on the claim for "excess labor." Merritt thus contends that any recovery by Baridon against it on the claim for excess labor is foreclosed by Article 6(b) of the contract.

When these claims were received by Western, they were investigated and considered by Fickinger, a Western engineer, and Kalmbach, an architectural engineer employed by Michigan Bell Telephone Company. Generally, they did not talk to the subcontractors involved in the claims and they did not consider what liabilities Merritt might have to its subcontractors apart from Western's obligations to Merritt. The District Judge found within those limitations "Fickinger's decisions and allowances were notably fair."

In the Merritt-Baridon contract, by Article 7, provision was made for the settlement of controversies or claims by arbitration in New York, but that Article was limited to controversies or claims "provision for the determination of which is not made elsewhere in this agreement." Baridon sought to submit its claims to arbitration under the provisions of Article 7, but Merritt applied to the New York Courts for a restraining order. The restraining order was granted and Baridon appealed to the Appellate Division of the Supreme Court of New York. There, the restraining order was affirmed, the opinion of the Appellate Division in pertinent part being as follows: [3]

> "Specifically excluded from the arbitration clause were disputes for which provision for determination was otherwise made in the agreement. Since such a provision for determination of disputes as to the claims made by the sub-contractor herein is included in another part of the agreement, there is no contract to arbitrate them. Hence, a stay of the arbitration was properly granted. We do not consider whether appellant has any alternate remedy. All we decide is that the matter in dispute is not arbitrable under the express terms of the contract."

Baridon subsequently sought, but was denied, leave to appeal to the New York Court of Appeals.

The New York litigation was thus a final judicial determination that Article 6(b) was a provision for the determination of this claim for "excess labor," for the only provision to which the New York courts could have referred is Article 6(b). Under the doctrine of collateral estoppel, the issue litigated in New York and finally determined in the courts of that state is not open for reconsideration here.[4]

The District Court quoted Article 6(b), among others, as being relevant to the inquiry. It did not thereafter directly refer to it. We may infer that it laid aside Article 6(b) on the basis of its finding that Fickinger and Kalmbach considered the claims only from the standpoint of Western's obligations to

3. Application of Merritt-Chapman & Scott Corp., 7 App.Div.2d 627, 179 N.Y.S.2d 187, 188.

4. See Partmar Corporation v. Paramount Pictures Theatres Corp., 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532; Reo Garment, Inc. v. The Jason Corporation, 6 App.Div. 2d 401, 178 N.Y.S.2d 368; Eidelberg v Zellermayer, 5 App.Div.2d 658, 174 N.Y. S.2d 300; Statter v. Statter, 2 N.Y.2d 668, 163 N.Y.S.2d 13, 143 N.E.2d 10.

Merritt without considering any "agreements, correspondence or conversations between Merritt and Baridon." With respect to some of the claims, as those for brattice cloth, there were dealings between Merritt and Baridon, and a determination of Western's obligations to Merritt, without consideration of the dealings between Merritt and Baridon, should not foreclose Baridon's claims against Merritt to the extent that they were founded upon agreements and conversations between Merritt and Baridon.

The claim for "excess labor," however, rests solely upon the assertion of disruption of the work by Western's change orders. Merritt, like Baridon, was a victim of those change orders to the extent that they were excessive in number. It had no independent responsibility for them. It was obligated to execute them just as Baridon was. The record does not disclose that it did anything else. There were no "agreements, correspondence or conversations" between Merritt and Baridon which are material to the claim for "excess labor," or which affect it in any way. It follows, therefore, that if Article 6(b) means anything whatever and if any effect is to be given the result of the litigation in the Courts of New York, the disallowance of this claim by Fickinger and Kalmbach is binding upon Merritt and Baridon and forecloses litigation of this claim.

The District Court also found that Fickinger and Kalmbach, in general, refused to talk to subcontractors. They permitted Baridon to appear before them and verbally argue its brattice cloth claims, but the claim of "excess labor" was disposed of by Fickinger and Kalmbach without oral argument.

The effect of Article 6(b), of course, would be avoided if Merritt's presentation of Baridon's claim for "excess labor" was grossly deficient or if Merritt's representation of Baridon in presenting and prosecuting that claim was wanting in good faith. Baridon and its attorneys, however, stoutly disclaim any intention of charging Merritt with any fault or shortcoming in the presentation and handling of Baridon's claims with Fickinger and Kalmbach. In fact, then, that Baridon was not afforded an opportunity to appear through its own officers before Fickinger and Kalmbach and verbally contend for allowance of its claim furnishes us with no justification for refusing to apply Article 6(b).

Provisions similar to Article 6 (b) are familiar features of construction contracts. They impose a high degree of responsibility upon the engineers and architects whose decisions are made controlling, but they serve the useful office of avoiding extensive and expensive proceedings before arbitrators and in courts for the adjustment of the multitude of disputes which arise routinely in the performance of construction contracts. The Courts of New York, as those of most states, enforce such provisions,[5] and the fact that the engineer or the architect has been selected and employed by the owner is not a reason for disregarding his determination so long as he acts in good faith and without obvious mistake.[6]

Here, Fickinger was not an independent engineer, but apparently regularly employed by Western. Kalmbach, however, was employed by Michigan Bell Telephone Company and, apparently, had no other connection with Western. Moreover, it does not appear that Western had any financial interest in the disallowance of the Baridon claims for, apparently, it was entitled to reimbursement by the United States for whatever it determined it owed to Merritt. From all that appears in the record, Fickinger had no interest other than a fair deter-

5. See Sweet v. Morrison, 116 N.Y. 19, 22 N.E. 276; Chas. S. Wood, Inc. v. Alvord & Swift, 232 App.Div. 603, 251 N.Y.S. 35, aff'd 258 N.Y. 611, 180 N.E. 354; Agostini v. State, Ct.Cl.N.Y., 40 N.Y.S. 2d 598.

6. See, e. g., Schiavi v. Mayor and City Council of Baltimore, D.Md., 40 F.Supp. 184; J. A. LaPorte Corporation v. Mayor and City Council of Baltimore, D.Md., 13 F.Supp. 795; see cases cited footnote 5, supra.

mination of the claims, and the District Court, with reason, found that Fickinger's determinations were "notably fair" subject to the limitation that he considered only Western's obligations to Merritt without inquiring into the possibility of any independent obligation by Merritt to Baridon, a limitation which is irrelevant to the claim for excess labor.

Baridon suggests that its contract does not itself specify the person or persons who would make the determination under Article 6(b), but the contract between Western and Merritt contained a provision that the work would be performed at the direction and under the supervision of Fickinger, and the Merritt-Baridon contract contained a provision subjecting it to all provisions in the prime contract between Western and Merritt.

Finally, Baridon contends that since the excess labor claim is one for additional compensation, the final clause of Article 6(b) makes Article 4 applicable and exclusive of Article 6(b). It is plain, however, that Article 4 is a limitation upon such claims and not a remedy for their enforcement or, if disputed, a means for their determination. The final clause of Article 6(b) does not purport to make that Article inapplicable. Its obvious purpose was to make a determination between Western and Merritt a controlling substitute for the written agreement contemplated by Article 4 to the extent that the same matter was involved.

Accordingly, we conclude that as to the claim for "excess labor," there has been a final determination that Western has no obligation thereon to Merritt, and that determination is binding upon Baridon, for the Baridon claim against Merritt is entirely coextensive with Merritt's claim against Western and has no independent support warranting a conclusion that Merritt had assumed liabilities therefor which were not imposed upon Western. For such reasons, we conclude the judgment of the District Court was erroneous to the extent that it allowed Baridon to recover $12,000 from Merritt on the claim for "excess labor."

### Profit on Allowed Claims

The District Court allowed 15% for overhead upon the claim for overtime wages paid. Additionally, it allowed 5¼% of that amount for payroll taxes and insurance, which are out-of-pocket expenses and directly attributable to the overtime payment. It agreed with Merritt that nothing should be allowed for profit on that item. Nevertheless, the District Court allowed 25% for overhead and profit on other allowed items of damage. These were $1,824.95 for increased labor cost, that being the amount which Merritt had paid on that account, and Baridon was willing to accept it and was not claiming more, $2,562.45 for material cost increase, being the amount which had been allowed by Western and which Merritt had paid, $16,940 for board expense of nonresident employees, being the amount which Western had allowed and Merritt had paid, and being in the words of the District Court "eminently fair" in light of Baridon's previous receipt of an additional sum of $6,464.21 on that account, and $1,895.84, being the amount of Baridon's claim on account of the larger hubs at Truax, a claim which Merritt did not contest.

The allowed claims, therefore, are all items which Western had determined to be allowable and which, subsequently, Merritt conceded and paid or agreed to pay. We assume none of them included any overhead increment, for Merritt does not contest the allowance of an additional sum for overhead upon each of those items, but does contend an additional sum by way of profit should not have been allowed. We agree.

This was a fixed price contract. It was not a contract for cost reimbursement plus a fixed sum or percentage of cost to cover overhead and profit. If Baridon suffered damages because Merritt failed to discharge its contractual obligations to Baridon, Baridon is entitled to be made whole, but there is no basis for a claim by it of increased profit by reason

of Merritt's contract violations. If there had been no contract violation, Baridon would not have been put to the increased cost, but when the cost increases are paid to it, it is made whole without any overall addition to the determined damages on account of unrealized profit.[7] Indeed, the allowed claims appear to stand together on the same footing, and if profit was not allowable upon the overtime compensation claim, it should not have been allowed upon any of the other claims.

 Since the District Court allowed 25% for overhead and profit without indicating what part of that amount was overhead and what part profit, we cannot determine what portion of the allowed amount represents the profit.[8] The case will be remanded to the District Court for a determination of the amount which should be allowed for overhead upon these claims.

PREJUDGMENT INTEREST

 The District Judge allowed prejudgment interest at the rate of 6% upon the net balance it found to be due. Under the circumstances of this case, it was appropriate for the District Court to allow prejudgment interest at such a rate as would compensate the plaintiff for the delay in the receipt of its money. The question of what is compensatory depends primarily upon the money market and not upon the maximum lawful interest rate in the state of the forum.[9]

The District Court made no finding of the rate of interest which would be necessary to compensate the plaintiff for the delay in receipt of its money. Its allowance of 6%, without explanation, may

have been on the basis of the maximum legal rate in Maryland. Upon remand, the District Court may determine and allow interest upon the net amount found to be due to Baridon in such amount as will compensate Baridon for the delay, not exceeding the maximum allowable interest rate in Maryland, but otherwise without reference to that maximum.

### CONCLUSION

The judgment of the District Court is affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion.

Affirmed in part, reversed in part and remanded.

---

7. Torres v. United States, 112 F.Supp. 363, 126 Ct.Cl. 76.

8. The District Court allowed 15% for overhead upon the claim for overtime. Apparently, with respect to that item, Baridon claimed 15% for overhead. With respect to other items, however, it claimed that its overhead was much greater and the District Court referred to those larger claims in considering an allowance for overhead and profit on the other claims. From the allowance of 25% for both over-

head and profit on the claims other than the claim for overtime, therefore, we cannot say that he intended to allow only 15% for overhead.

9. Montgomery Ward & Co. v. Collins Estate, Inc., 4 Cir., 268 F.2d 830; E. I. Du Pont De Nemours and Company v. Lyles & Lang Construction Company, 4 Cir., 219 F.2d 328; Chesapeake & Ohio Ry. Co. v. Elk Refining Co., et al., 4 Cir., 186 F.2d 30, 36 A.L.R.2d 329.