918 F.2d 955
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
John V.W. BUIE, Barbara Bleiweis, Plaintiffs-Appellees,
v.
SYSTEM AUTOMATION CORPORATION, Defendant-Appellant,
and
Alfred Rubin, Defendant.
John V.W. BUIE, Barbara Bleiweis, Plaintiffs-Appellants,
v.
SYSTEM AUTOMATION CORPORATION, Alfred Rubin, Defendants-Appellees.
 Nos. 89-2688, 89-2786.
 United States Court of Appeals, Fourth Circuit.
 Argued April 5, 1990.
Decided Nov. 21, 1990.
As Amended Dec. 6, 1990.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. James C. Cacheris, District Judge. (CA-88-1063-A)
 Nathan Lewin, Miller, Cassidy, Larroca & Lewin, Washington, D.C., (argued) for appellants:
 Douglas F. Curtis, Miller, Cassidy, Larroca & Lewin, Washington, D.C., Edward J. Tolchin, Ginsburg, Feldman and Bress, Chartered, Washington, D.C., on brief.
 David H. Shapiro, Kator, Scott & Heller, Washington, D.C., (argued) for appellee: Amy E. Wind, Kator, Scott & Heller, Washington, D.C., on brief.
 E.D.Va.
 AFFIRMED IN PART AND REVERSED IN PART.
 Before ERVIN, Chief Judge, PHILLIPS, Circuit Judge, and GARBIS, United States District Judge for the District of Maryland, Sitting by Designation.
 GARBIS, District Judge:
 Plaintiffs John V.W. Buie and Barbara Bleiweis, employees of defendant System Automation Corporation ("S.A."), sued S.A. and its president, Alfred Rubin, for fraud and breach of contract arising from S.A.'s failure to pay the sales commissions to which they allege they are entitled under S.A.'s Sales Compensation Plan. The district court granted summary judgment in favor of defendant Rubin, and it directed a verdict against plaintiff Bleiweis. The jury returned a verdict in favor of Buie and against S.A., the only two parties remaining at the end. Both sides appeal.
 Statement of the Case
 S.A. is a privately-held, high-technology company that provides sophisticated computer software and system development services to government and commercial clients. In the spring of 1986, in an effort to boost lagging sales, S.A. hired a Director of Marketing, Joseph Hasuly, who was instructed to hire sales representatives who could expand S.A.'s share of the market and develop new business opportunities for the company. In conjunction with that effort, Buie was offered a position as a Sales Representative on July 1, 1986. Bleiweis was offered a Sales Representative position on July 10, 1986.
 As compensation, Buie and Bleiweis were to receive a base salary ($45,000 per year for Buie and $36,000 for Bleiweis), and they would be eligible for bonuses and commissions as outlined in S.A.'s Sales Compensation Plan. A 12-page document outlining the job descriptions and bonus incentives for sales positions within S.A., the Sales Compensation Plan (the "Plan") contains the contractual provisions on which this suit is based.
 The Plan defines two categories of sales employees. A "Sales Representative" is defined as a "[d]esignated SA Representative whose primary focus and responsibility is the identification and development of new business." Joint Appendix ["J.A."] 62. An "Account Representative" is defined as a "[d]esignated SA Representative whose primary focus and responsibility is the growth and expansion of current customer business and is a participant in the [Plan]." J.A. 61. It is undisputed that the two plaintiffs were hired as Sales Representatives. J.A. 72-73.
 These categories of employees are important because they are compensated in different ways. For a Sales Representative,
 An incentive of 2% of contract revenue will be payable for contract awards listed on the Representative's most current PAF and awarded after the implementation of this plan. An incentive of 3% of the contract value will be paid for a contract with a New Client, with the remaining option years paid at a 2% rate.
 J.A. 68. In contrast, for an Account Representative,
 An incentive of 0.5% of contract revenue for Continuing Follow-on and Recompete business will be payable for awards listed on the Account Representative's most current PAF. An incentive of 2% of contract revenue will be paid for New Business as defined on the Account Representative's most current PAF. An incentive of 3% of the contract value will be paid for a contract with a New Client with the remaining option years paid at a 2% rate.
 J.A. 70.[1] Thus, the lowest commission level indicated for a Sales Representative is 2%, while the lowest level indicated for an Account Representative is 0.5%.
 In negotiations leading to his employment at S.A., Buie was told that he would be concentrating on a particular project known as "Keystone." Though S.A. had worked on aspects of the project for many years, Buie was told that it was being competitively bid for the first time. J.A. 452. Buie was told that S.A.'s future was at risk if the company did not win the Keystone contract. J.A. 452. Buie also was to work on Project 80-X, in which S.A. was to service a portion of Electronic Data Systems' prime contract with the federal government. Buie began working at S.A. in July 1986.
 On September 18, 1987, S.A. learned that it had won the Keystone contract, although the contract was not officially signed until September 11. J.A. 477-80. In late August 1987, Buie learned he would receive a commission of only 0.5% on Keystone. Buie disputed that decision, but in mid-September Rubin told Buie he would stand by his original interpretation of the Plan. J.A. 471. Rubin stated that Keystone was only a "recompete" project under the Plan and that on that project Buie was doing "Account Representative" work. Therefore, he would receive the Account Representative commission of 0.5%. J.A. 472. Buie again wrote Rubin a long memo, asking him to reconsider his interpretation of the Plan, but Rubin responded that Buie would be "paid at the account rep rate." J.A. 476.
 In pursuing his claim for a higher commission, Buie argued his case to Rubin, the president of S.A. and owner of 92% of the company's stock, J.A. 510, because the Plan gives him the power to interpret it and resolve disputes. The Plan indicates:
 
 
 1
 The President of SA shall have final authority to interpret this [Plan] and to resolve any dispute concerning its administration or any payments due to any Representative.
 
 
 2
 J.A. 60. In addition, Rubin also had the power to modify the contents of the Plan at any time. The Plan states that it
 
 
 3
 may be modified, suspended, or discontinued at any time by the President of SA or the Administrator. Any such changes shall apply to all participants who are covered by this [Plan].... SA reserves the right to ... [m]ake any adjustments or revision to incentive objectives, incentive payments, salaries, draws, bonuses, program or contract assignments, or any other relevant matters affecting the Representative's employment.
 
 
 4
 J.A. 60. Thus, in "interpreting" the Plan in the course of "resolving any disputes," Rubin also had the power under the Plan to "modify," "suspend," or "discontinue" it "at any time."
 
 
 5
 SA received the Keystone contract in September 1987, and the contract was valued in excess of $3 million. Buie was paid commissions at the rate of 0.5%. Project 80-X was awarded to S.A. in early December 1987, and both sides had signed the contract by December 17, 1987. Buie was paid no commissions on Project 80-X, and he never received a 2% commission on Keystone. J.A. 497-98.
 
 
 6
 On December 7, 1987, Buie was informed S.A. was having severe financial problems and that he would be fired. On December 21, 1987, Buie was fired. J.A. 128. Buie asked to be paid the commissions he had earned on these projects, and he asserted that he should be paid these commissions even after he was fired. Rubin rejected this request, arguing that the Plan did not provide for post-termination commissions. The Plan provides:
 
 
 7
 If a representative terminates employment with SA for any reason other than [illness, disability, retirement or death], all incentive compensation awards earned but not paid prior to termination shall be forfeited. This includes any deferred payments of revenue incentive. SA shall have no further liability to the Representative nor accept any claims for incentive payments for future bookings, contract and/or modifications thereto, regardless of responsibilities prior to termination.
 
 
 8
 J.A. 65. Based on his interpretation that this passage did not provide for post-termination commissions, Rubin did not pay any commissions to Buie after he was fired.
 
 
 9
 Bleiweis began working at S.A. in July 1986. In January and June 1987, Bleiweis was assigned to work on two existing S.A. accounts, one with the Corps of Engineers, known as "CEAP," and one with the Nuclear Regulatory Commission ("N.R.C."). Bleiweis was paid 2% commissions between August 1986 and August 1987 for her work on these two projects. On August 24, 1987, however, Bleiweis was informed that it had been an error to pay her 2% commissions on these two contracts and that in the future she would receive only 0.5%. J.A. 113. Bleiweis disputed this change in compensation with Rubin. Rubin responded that he categorized the two projects as continuing business, and he stated that for these projects she was doing "Account Representative" work. Rubin stated that Bleiweis would be compensated at the Account Representative rate and would receive only 0.5% in the future. J.A. 187-89. S.A. did not demand reimbursement for the past over-payments.
 
 
 10
 Bleiweis was informed on November 2, 1987, that she was being fired. J.A. 230-31. Rubin explained that Bleiweis had brought in no new business and that a project she had been working on had been awarded to a competitor. It is not disputed that during the time she worked at S.A., Bleiweis did not land any of the new contracts on which she had worked.
 
 
 11
 Plaintiffs filed the complaint in this action on August 23, 1988, alleging fraud on the part of both S.A. and Rubin and breach of contract by S.A.[2] Both counts in the complaint were based on both of plaintiffs' claims, the claim for 2% commissions and the claim for post-termination commissions. J.A. 13. With respect to Buie's claims, the complaint specifically focused on the Keystone and Project 80-X contracts. With respect to Bleiweis' claims, the complaint specifically focused on the CEAP and N.R.C. projects. J.A. 10-13.[3]
 
 
 12
 On December 16, 1988, the district court granted Rubin's motion for summary judgment, and all claims against Rubin in his individual capacity were dismissed from the case. Plaintiffs appeal that ruling.
 
 
 13
 Buie contended at trial that he was promised a 2% compensation for winning the Keystone contract. Buie testified that he had a "specific conversation" to that effect with S.A.'s general manager, Don MacDougall, the official who would determine Buie's commission compensation. According to Buie, MacDougall "represented that I would be hired as a sales representative, that I would be paid 2% on Keystone, on the Keystone contract when it was brought in as a competition." J.A. 451-52. Buie also testified that in mid-August 1987 MacDougall told him that Keystone would be considered a "new contract" for commission purposes. J.A. 465.
 
 
 14
 Director of Marketing Hasuly testified that he, MacDougall and other S.A. officials had discussions about giving Buie 2% on the Keystone contract. Hasuly also testified that he had discussed this anticipated compensation with Don MacDougall before Buie was hired. J.A. 335-36. Personnel Administrator Mark Lynch testified that he had conversations with MacDougall where MacDougall said that whoever won Keystone for S.A. would make over $100,000 in commissions on the project, a figure consistent only with a 2% commission. J.A. 359-60.
 
 
 15
 At trial, MacDougall denied that Buie was to receive a 2% commission on the Keystone project. He testified that he never intended to pay Buie a 2% commission on Keystone, J.A. 384, and that it had always been S.A.'s intention to pay a 0.5% commission. MacDougall said Buie would receive 2% only if he brought in new business beyond that contract. J.A. 410. He said he specifically recalled telling Buie, early in the period when work was being done on Keystone, that Buie would receive no more than a 0.5% commission. J.A. 411-12.
 
 
 16
 Bleiweis testified that Hasuly specifically told her that, although CEAP and N.R.C. were existing contracts, she would receive a 2% commission on those accounts. J.A 180. Lynch also testified that Bleiweis would receive 2% on those projects. J.A. 438. MacDougall testified that he had never told Bleiweis she would receive 2% on those projects, and he said it had never been S.A.'s intention to give her 2%. J.A. 410.
 
 
 17
 At the close of plaintiffs' case in chief, the district court granted S.A.'s motion for a directed verdict against Bleiweis. The court held that on the fraud claim for higher commissions, she had failed to show fraud by clear and convincing evidence. J.A. 34-35. On the contract claim, the judge stated that Bleiweis had failed to show that any of the contracts for which she claimed post-termination compensation were awarded to S.A. before she was fired. J.A. 35-36. Bleiweis appeals that ruling.
 
 
 18
 The district court denied S.A.'s motions for a directed verdict with respect to Buie's claims. On the fraud claim, the district judge indicated that MacDougall's testimony that "they never intended to pay him the 2% on Keystone" was sufficient to allow the claim to go to the jury. On the contract claim, the judge found that Buie had "raised a question as to whether he is entitled to any post-termination benefits when he was terminated." J.A. 35.
 
 
 19
 The jury returned a verdict in favor of Buie, awarding him $50,643.65 on the breach of contract claim and $99,356.35 on the fraud claim. The district court denied S.A.'s motion for JNOV or, in the alternative, for a new trial. In addition, the district court denied S.A.'s motion to require Buie to elect between the two theories of recovery. J.A. 43-50.
 
 
 20
 On appeal, S.A. argues that plaintiffs have no claim under the Plan because the Plan designates Rubin as the "final authority" on questions of interpreting the Plan. S.A. argues that this clause essentially designates Rubin as an arbitrator and that his decision, made honestly and in good faith, must be upheld. S.A. also argues that the provisions in the Plan giving S.A. unconditional authority to adjust the incentive payments and modify or suspend the SCP at any time preclude the reliance required for a fraud claim and defeat any breach of contract claim. In addition, S.A. argues that the breach of contract award cannot stand because the Plan does not authorize post-termination commissions. S.A. further argues that the fraud verdict cannot stand because there was no clear and convincing evidence of an intent to defraud, and because the district judge erroneously permitted the jury to award "benefit of the bargain" damages for fraud. Finally, S.A. argues that Buie must elect between the two theories of recovery, fraud and breach of contract, because awards based on both theories are mutually inconsistent.
 
 
 21
 Bleiweis argues on her cross-appeal that the district court should not have directed a verdict against her, arguing that viewing the evidence in the light most favorable to her there was sufficient evidence to support a verdict in her favor on both her breach of contract and fraud claims. In addition, Buie and Bleiweis both argue that the district court should not have dismissed Rubin as a defendant in the fraud claim.
 
 Defendant S.A.'s Appeal
 Rubin As Arbitrator
 
 22
 S.A. argues that the Plan provisions giving Rubin the power to interpret the Plan and allowing him to modify it at any time foreclose any challenge by plaintiffs to Rubin's decision regarding the commissions they will receive. In Nelley v. Mayor and City Council, 224 Md. 1, 166 A.2d 234 (1960), the Maryland Court of Appeals upheld the arbitration clause in a construction contract between a private contractor and the city, which provided that the Director of Public Works would referee any question touching the contract. The contractor had originally made its case for extra payment to the Sewerage Engineer, who denied the contractor's request. The contractor then took the request to the Director of Public Works, pursuant to the following provision in the contract: "to prevent disputes and litigations, the Director of Public Works will be the referee in case any question shall arise between the Contractor and the City touching the Contract, and his determination ... shall be final." Id., 166 A.2d at 236.
 
 
 23
 Although the contractor argued that the court should not defer to an arbitration where the arbitrator was a city official and the city was a party to the contract, the Court of Appeals upheld the arbitration. The court wrote:
 
 
 24
 [I]t is established that the parties to a contract may provide for the submission of disputes with respect to the contract to an arbitrator who is an official or representative of one of the parties, and that in the absence of a showing of fraud or bad faith on his part, his determination will be binding.
 
 
 25
 Id., 166 A.2d at 238. See also City of Baltimore v. Allied Contractors, Inc., 236 Md. 534, 204 A.2d 546 (1964).
 
 
 26
 We do not believe Nelley and cases like it require the court to regard Rubin's decision on what to pay his employees as a binding arbitration of the dispute between the plaintiffs and S.A. Several considerations distinguish the two situations. Under the Plan, Rubin holds the power not only to "resolve any dispute" concerning the Plan, but to "interpret" the Plan and "modify, suspend or discontinue" it "at any time." Throughout this case, S.A. has argued that one power or the other allows Rubin to make the decision he chooses with respect to the plaintiffs' commissions. In effect, Rubin claims the power to modify and interpret the Plan as he sees fit, and that in the guise of "resolving a dispute" he can implement that interpretation or modification, whichever it need be.[4] In arguing that we should defer to Rubin's "arbitration" of the decision, S.A. has cited no case where the arbitrator has simultaneously asserted the power to "modify" the contract he is interpreting. We believe the combination of these assertions would effectively render the contract illusory. Therefore, this could not have been the intent of the parties.
 
 
 27
 In addition, it is difficult to regard Rubin as a mere "official" of S.A. where he holds 92% of S.A.'s stock. This situation is fundamentally different from an arbitration of a city construction contract, where, although the Director of Public Works is a city official, it is the city's money that would be saved if the claimant is not paid. Here, if no commissions are paid out to plaintiffs, S.A. saves that money, and, as the 92% stockholder of S.A., Rubin saved that money, too.[5] Rubin was not just an "official" of S.A., he was S.A.
 
 
 28
 Moreover, although these cases have upheld arbitration even where the arbitrator is an official of one of the parties, all of the cases cited by S.A. in support of this point arose in the construction context. As noted in Clarke Baridon, Inc. v. Merritt-Chapman & Scott Corp., 311 F.2d 389 (4th Cir.1962), such arbitration provisions
 
 
 29
 are familiar features of construction contracts. They impose a high degree of responsibility upon the engineers and architects whose decisions are made controlling, but they serve the useful office of avoiding extensive and expensive proceedings before arbitrators and in courts for the adjustment of the multitude of disputes which arise routinely in the performance of construction contracts.
 
 
 30
 311 F.2d at 397. A "multitude of disputes" would arise in the course of a long construction project, and work on the project would grind to a halt if every dispute had to be taken to formal arbitration or to court. Therefore, such clauses are favored in that context, even where an official of one of the parties involved in the dispute is the designated arbitrator.
 
 
 31
 S.A. has cited no non-construction case in support of its argument that an arbitration by an official of one of the parties must be upheld as a matter of law. We do not hold that such clauses may not be enforced in a non-construction context. However, we will not adopt the reasoning supporting such arbitration in a construction context and apply it to the employment context in a case where, given Rubin's wide powers, he was something other than a simple arbitrator of a dispute.
 
 
 32
 We do not hold that Rubin actually acted in bad faith, nor does our holding depend on such a finding. We hold only that the customary considerations requiring a court to defer to a decision duly arbitrated by an official of one of the parties do not apply where the "official" owns 92% of the company and simultaneously holds the power to "modify" the contract he is interpreting. Rubin's "interpretation" of the contract is not the equivalent of the binding arbitration upheld under Nelley. These plaintiffs are, not as in essence defendants contend, prohibited as a matter of law from arguing their claims in court. Rubin is not the final arbiter.
 
 Oral Representations
 
 33
 Relying on Call Carl, Inc. v. B.P. Oil Corp., 554 F.2d 623 (4th Cir.1977), and Entre Computer Centers v. FMG of Kansas City, Inc., 819 F.2d 1279 (4th Cir.1987), overruled on other grounds, Busby v. Crown Supply, Inc., 896 F.2d 833 (4th Cir.1990), S.A. asserts that plaintiffs may not rely on any oral representations that contradict the written agreement between the parties contained in the Plan. According to S.A., plaintiffs may not reasonably rely on any oral representations contradicting the Plan, thus defeating one of the elements of their fraud claim.[6] S.A. argues the same reasoning defeats the breach of contract claim as well.
 
 
 34
 In Call Carl and Entre Computer, this court held that plaintiffs alleging fraud could not reasonably rely on oral representations directly contradicting the written agreement entered into by the parties. In Call Carl, although the franchise agreement in question specifically stated that the agreement could be terminated on 30 days' written notice given at the end of each yearly term, the plaintiffs alleged they had received oral representations that the agreements would be renewed each year. 554 F.2d at 629. In Entre Computer, although the franchise agreements in question stated specifically that they were non-exclusive as to the geographical areas of the franchises, plaintiffs alleged that they had received oral representations that the franchises would be exclusive. 819 F.2d at 1286. In both cases, this court held that the plaintiffs could not show the reasonable reliance necessary to establish their fraud claims where the alleged oral representations directly contradicted the written agreements.
 
 
 35
 We do not believe the cases cited govern the case before us. Put simply, the oral representations on which Buie relies do not directly contradict the Plan. The Plan does not indicate anywhere what commissions S.A. would pay on the Keystone project or on Project 80-X. Buie's claims that as a Sales Representative he was entitled to a 2% commission and that he was specifically told that he would receive a 2% commission did not directly contradict anything in the Plan, and so he is not prohibited from reasonably relying on them in advancing his fraud claim.[7]
 
 
 36
 In addition, S.A. argues that the clause allowing it to modify commissions compensation prohibits Buie from relying on any representations as to the compensation he would receive. As the district court pointed out, Call Carl would prohibit Buie from relying on a representation that S.A. would not modify the Plan, for such a representation would be directly contradictory to the power it clearly is given by the Plan. J.A. 27-28. But in the absence of an actual modification, the modification clause does not prevent Buie from relying on representations as to promised commissions that are not inconsistent with the Plan. Although the Plan does not indicate a procedure to be followed in modifying it, Rubin himself testified at trial that such modifications would have to be in writing. J.A. 520-21. In any event, S.A. has not alleged that it actually did modify the Plan, other than arguing that if in interpreting the Plan Rubin actually modified it, well, then he had the power to do so. The presence of the modification clause does not as a matter of law prohibit Buie from relying on oral representations that do not contradict the written contract, and that clause does not defeat his fraud claim.
 
 Post-termination Commissions
 
 37
 S.A. argues that the jury's verdict in the breach of contract action cannot stand because the Plan appears to limit commission payments to current employees. As S.A. points out, the question of a salesman's right to commissions "is dependent almost entirely upon the language of the contract and the construction to be given thereto." Chesapeake & Potomac Tel. Co. v. Murray, 198 Md. 526, 536, 84 A.2d 870, 874 (1951). If a contract provision is ambiguous and can be interpreted in different ways, the question of the proper interpretation is reserved for the jury. See Masano v. Albritton, 245 Md. 423, 226 A.2d 299 (1967); Combs v. Dickenson-Wise Medical Group, 233 Va. 177, 355 S.E.2d 553 (1987).
 
 The relevant provision of the Plan states:
 
 38
 If a representative terminates employment with SA for any reason other than [illness, disability, retirement or death], all incentive compensation awards earned but not paid prior to termination shall be forfeited. This includes any deferred payments of revenue incentives.
 
 
 39
 J.A. 65. The district court held that the passage was ambiguous as to whether it means that post-termination commissions are forfeited only when the representative terminates his employment, or whether commissions are forfeited when the employment relationship is terminated by either party or for some other reason. J.A. 23-24.
 
 
 40
 As an initial matter, we agree with the district court that the language cited can be read either way and that the question was a proper one for the jury. As to the jury verdict itself, we cannot say that the record does not contain substantial evidence to support the conclusion that the Plan provides for post-termination commissions. Personnel Administrator Lynch, a witness called by S.A. as an expert in the Plan, testified that the Plan was silent as to whether post-termination commissions would be paid in the case of an involuntary termination from the company. J.A. 434. The jury heard evidence that both of the contracts on which Buie claims post-termination commissions, Keystone and Project 80-X, had been awarded before Buie was fired. The jury was entitled to conclude that under the Plan he should have been given commissions after S.A. terminated his employment, and we uphold that portion of the verdict.
 
 Evidence of Intent to Defraud
 
 41
 S.A. argues that the evidence introduced at trial was not sufficient to prove an intent to defraud Buie on the part of S.A. The elements of a fraud claim must be proven by "clear and convincing" evidence. See Thrifty Diversified, Inc. v. Searles, 48 Md.App. 605, 429 A.2d 270, 274 (1981). In reviewing a jury verdict, "our task is to determine whether, when viewed in the light most favorable to the prevailing party, the record contains substantial evidence to support the jury's verdict." Entre Computer Centers, 819 F.2d at 1283 (citations omitted). The evidence advanced in support of a jury verdict "must be greater when the burden is proof by clear and convincing evidence than when the burden is proof by a preponderance of the evidence." Id. at 1285 (citations omitted).
 
 
 42
 We believe the evidence in the record is sufficient to support the jury's verdict, even under the clear and convincing standard. The jury heard from several different sources that S.A. had represented to Buie, both before and after he began working on the Keystone project, that he would receive a 2% commission. It was MacDougall's decision, as S.A.'s general manager, to determine the commission paid on Keystone. J.A. 384. Buie testified that MacDougall had told him before he accepted his offer of employment that he would be paid 2% on Keystone. J.A. 450-51. Hasuly testified that he had discussions with MacDougall about giving Buie 2% and that MacDougall concurred with that plan. Lynch testified that he had heard MacDougall say in conversation that the sales representative on Keystone would receive over $100,000 in commissions on Keystone, J.A. 359-60, a figure that is consistent only with a 2% commission.
 
 
 43
 Notwithstanding this testimony, MacDougall testified that he never intended to pay Buie 2% on Keystone. Under questioning by counsel for the plaintiffs, MacDougall testified that he never intended to pay Buie as a Sales Representative for bringing in Keystone. J.A. 384. MacDougall also testified under questioning by counsel for S.A. that there was never an intent to give Buie 2% on Keystone. J.A. 410-11. We believe that in weighing the witnesses' testimony and credibility the jury was entitled to find clear and convincing evidence of an intent to defraud, and we will not disturb the jury's verdict.[8]
 
 Damages Awarded
 
 44
 S.A. argues that the district court improperly instructed the jury that Buie was entitled to recover the "benefit of the bargain" as damages for his fraud claim. The district court stated:
 
 
 45
 The general rule prevailing in most jurisdictions is that a person acquiring property by virtue of a commercial transaction, who has been defrauded by false representations as to the property, may recover as compensatory damages in a tort action the difference between the actual value of the property at the time of making the contract and the value that it would have possessed if the representations had been true.
 
 
 46
 The defrauded party is thus entitled to recover the difference between the real and the represented value of the property, or, in other words, is entitled to the benefit of the bargain. But damages for loss of expectancy of profits created by prior or contemporaneous oral representations that contradict the terms of a written contract are not recoverable.
 
 
 47
 J.A. 39. S.A. argues that the "benefit of the bargain" instruction was improper, and that if the last sentence of this second paragraph was intended to cure the original error, it did not do so properly.
 
 
 48
 As an initial matter, questions were raised at oral argument whether one could be sure that the damages for the contract claim were not duplicated in the award on the fraud claim. In response to these concerns, counsel for the plaintiffs argued that it had been clear to the jury that the breach of contract action was addressed only to the claim for post-termination commissions, and that the fraud action was addressed only to the claim for higher commissions. Thus, according to counsel, the jury awarded separate damages for Buie's separate claims.
 
 
 49
 To the contrary, it is apparent from the district court's instructions that in deciding the breach of contract claim the jury was told to consider both the claim for post-termination commissions and the claim for a higher commission rate. The district court stated:
 
 
 50
 A plaintiff's damages for breach of contract are the amounts that would have been paid if the contract had not been breached. This means that the damages for the breach of an incentive payment contract should equal the amount of incentive compensation that the party should have been paid, but was not paid.
 
 
 51
 If you determine that an oral contract existed between defendant and with plaintiff with regard to a higher rate of compensation, the amount of damages should equal the difference between incentives under the higher rate of compensation pursuant to the oral agreement and the compensation actually paid.
 
 
 52
 If you determine a contract entitled plaintiff to post-termination compensation, then you should award damages to the plaintiff in the amount that such post-termination agreements contemplated.
 
 
 53
 J.A. 37-38 (emphasis added). From these instructions, it is apparent the jury considered the claim for a 2% commission in the breach of contract action, even as they were considering that claim in the fraud action.
 
 
 54
 In addition, we think it is noteworthy that the damages for both actions, $99,356.35 on the fraud claim and $50,643.65 on the breach of contract claim, total $150,000 combined. The record does not indicate how the jury reached those particular numbers on those particular claims, and counsel have not offered any explanation on appeal. The total award appears most likely to have been based on Buie's testimony that at the time he was considering accepting S.A.'s offer, he had an alternative offer from a company called Storage Technology, where he said he "had the opportunity to make $150,000 a year." J.A. 454. Where the specific awards for these two claims do not appear to have any specific basis in fact, but the total award very neatly coincides with what Buie said he could have gotten elsewhere, the conclusion is inescapable that the jury awarded in total what it considered to be Buie's "benefit of the bargain" damages.
 
 
 55
 With these concerns in mind, we turn to S.A.'s objections to the district court's instructions regarding damages. As discussed above, Call Carl held that it was not reasonable to rely on oral representations directly contradictory to a written agreement, thus defeating an element of the plaintiff's fraud claim. With respect to fraud damages, the court also held, in the language quoted by the district court in its instructions to the jury in this case, that "damages for loss of an expectancy of profits created by prior or contemporaneous oral representations plainly contradictory with the terms of a written contract [are] not recoverable." 554 F.2d at 630. We have previously indicated that the oral representations on which Buie relied in expectation of a 2% commission on the projects he worked on did not directly contradict the Plan and thus could be reasonably relied on, so this aspect of the Call Carl holding on damages is not directly applicable to the case at hand.
 
 
 56
 However, the court also noted in Call Carl that the benefit of the bargain measurement of damages may by applied "in appropriate cases," but that that case was not one of them. Call Carl, 554 F.2d at 629 (citing Hinkle v. Rockville Motor Co., 262 Md. 502, 278 A.2d 42 (1971)). We believe that this case is likewise not an appropriate one for that measurement of damages.
 
 
 57
 In Hinkle the Maryland Court of appeals adopted a flexible approach in awarding damages for fraud, and it identified four rules for evaluating when benefit of the bargain damages should be awarded. Among others, the court included the following considerations:
 
 
 58
 "(3) where the circumstances disclosed by the proof are so vague as to cast virtually no light upon the value of the property had it conformed to the representations, the court will award damages equal only to the loss sustained; and
 
 
 59
 "(4) where ... the damages under the benefit-of-the-bargain rule are proved with sufficient certainty, that rule will be employed."
 
 
 60
 Hinkle, 278 A.2d at 47 (quoting Selman v. Shirley, 161 Or. 582, 85 P.2d 384 (1938)). Given the apparent basis on which the jury awarded the total damages, the total award does not satisfy the criteria set forth in Hinkle. The "proof" of damages of $150,000 was vague enough, and the actual value of the benefit of the bargain damages was uncertain enough, that this court feels that even under the "flexible approach" in Maryland, this case is not one in which the benefit of the bargain approach should be employed.
 
 
 61
 In sum, we believe the jury made a duplicative award by awarding damages for the higher commission rate in both the breach of contract and fraud actions. Given our additional concerns that the jury based its total award on what they thought was a measurement of the benefit of the bargain Buie lost by joining S.A., and that this case is one in which the benefit of the bargain measurement of damages should not be used, we reverse the portion of the judgment based on the jury's award of damages on the breach of contract claim.
 
 Election Between the Verdicts
 
 62
 S.A. argues that Buie must elect between the jury verdicts in his favor for fraud and breach of contract, because they are mutually inconsistent. Because we reverse the portion of the judgment based on the jury's verdict on the contract claim, this point is now moot.
 
 Plaintiffs' Cross-Appeal
 Directed Verdict as to Bleiweis
 
 63
 Bleiweis argues that, viewing the evidence in the light most favorable to her, she produced enough evidence to get to the jury on her breach of contract and fraud claims. We agree with the district court that Bleiweis did not introduce sufficient evidence on either of her claims.
 
 
 64
 As to her claim for post-termination commissions, during her tenure at S.A. Bleiweis failed to win any of the new contracts she had worked on. J.A. 35-36. Therefore, there was no factual basis for any claim that after she left S.A. she should have received commissions on contracts she had won.
 
 
 65
 As to her claim for commissions of 2% rather than 0.5%, we agree with the district court that "Bleiweis has failed to show by clear and convincing evidence that there was a fraud that was committed on her." J.A. 35. In contrast to Buie, Bleiweis did not introduce any evidence that MacDougall, the S.A. official who decided the commission rates to be awarded, ever represented to her that she would receive commission rates other than what was indicated in the Plan. Even viewing the evidence in the light most favorable to her, Bleiweis did not introduce evidence to support a finding of a misrepresentation or of an intent to defraud. The directed verdict was appropriate.
 
 Summary Judgment as to Rubin
 
 66
 Both plaintiffs argue that the district court should not have granted summary judgment in favor of Rubin on the fraud claim. To hold a corporate official responsible for a corporation's fraud, Maryland law requires that the evidence demonstrate that the official used or intended to use the corporation as an instrument to perpetrate a fraud. See Damazo v. Wahby, 259 Md. 627, 270 A.2d 814, 817 (1970). Plaintiffs produced no evidence that Rubin himself made any statement regarding anticipated commissions. At most, plaintiffs alleged that Rubin allowed the fraud to occur, and that is insufficient to hold him personally liable. We affirm the district court's grant of summary judgment in favor of Rubin on this claim.
 
 Conclusion
 
 67
 For the foregoing reasons, the judgment of the district court is affirmed as to Buie's fraud claim, but reversed as to his breach of contract claim. The judgment of the district court is affirmed as to the plaintiffs' cross-appeal.
 
 
 68
 AFFIRMED IN PART AND REVERSED IN PART.